Mr. Justice SWAYNE
 

 stated the case and delivered the opinion of the court.
 

 Alexander Banter filed his libel in the District Court
 
 *237
 
 above named against the owners of the bark Maggie McNiel, wherein it was set forth that the libellant was a pilot of the port of New York, duly licensed under the laws of the State of New York, to pilot vessels by way of Hellgate, and that the respondents were the owners of the bark; that on the 27th day of February, 1870, the libellant, at a point on Long Island Sound, tendered his services and offered to the master of the bark to pilot her by way of Hellgate to the port of New York, and notwithstanding that the libellant was the first pilot so offering his services they were refused; that the bark was a registered vessel foreign to the port of New York, and drew more than thirteen feet of water, so that there became due to the libellant by reason of the premises the sum of twenty-three dollars; that payment has been demanded and refused, and that the premises are within the admiralty and maritime jurisdiction of the United States and of the court to which the libel was addressed.
 

 Process was issued according to the prayer of the libel, and the respondents not being found the vessel was attached. Alexander McNiel intervened as claimant and answered the libel. The answer denies that the action is founded upon a contract- civil and maritime. It admits that the bark was sailing under a register, and alleges that she was towed through Hellgate by a steam-tug, which had on board a duly licensed pilot, and that the master of the bark paid for the service. It insists that the cause of action set forth in the libel is not enforceable by the District Court and not within its jurisdiction. Testimony was taken, the cause proceeded to hearing, and the court gave judgment for the amount claimed by the libellant. The respondent applies for a writ of prohibition to restrain the District Court from enforcing the judgment.
 

 The grounds relied upon are:
 

 (1) That the District Court has no jurisdiction of the cause of action stated in the libel.
 

 (2) That no lien existed on the vessel enforceable in a court of admiralty.
 

 The statute of the State upon which the libel was founded
 
 *238
 
 is entitled “ An act concerning the Pilots of the Channel of the East River, commonly called Ilellgate, passed April 15th, 1847, as amended March 12lh, 1860, March 14th, 1865, April 16th, 1868, and April 5th, 1871.” It is a carefully digested system of regulations, covering the whole subject of pilotage, and was designed to secure the appointment of qualified persons and to insure as far as possible the faithful performance of their duties. All appointments are required to be made upon the recommendation of the board of wardens of the port of New York to the governor, the nomination by him to the Senate of the State of the persons so recommended, and their confirmation by that body. Apprentices are required to serve three years, to be examined twice during the last year by the board of wardens, and to serve two years afterwards as deputies before they can be appointed pilots. The seventh section of the act provides that a pilot who shall first tender his services may demand from the master of any vessel of one hundred tons burden and upwards, navigating Hellgate, to whom the tender was made and by whom it was refused, half-pilotage, the amount to be ascertained according to the rules prescribed by the act. Certain exceptions are made which do not atfect this case and which it is therefore not necessary to consider.
 

 It is not denied that the case made by the libel is within the statute, nor that it was established by the testimony, but it is insisted that the statute is in conflict with the power of Congress to regulate commerce, and is therefore void.
 

 It must be admitted that pilot regulations are regulations of commerce. A pilot is as much a part of the commercial marine as the hull of the ship and the helm by which it is guided; and half pilotage, as it is called, is a necessary and usual part of every system of such provisions. Pilots are a meritorious class, and the service in which they are engaged is one of great importance to the public. It is frequently full of hardship, and sometimes of peril; night and day, in winter and summer, in tempest and calm, they must be present at their proper places and ready to perform the
 
 *239
 
 duties of their vocation. They are thus shut out for the time being from more lucrative pursuits and confined to a single field of employment.
 

 It is not complained anywhere, so far as we are advised, that the sum of what is allowed them is oppressive, or that including half-pilotage, it is more than sufficient to secure the services of persons of proper qualifications and to give them a reasonable compensation.
 

 There is nothing new in provisions of the same character with the one here under consideration. They have obtained from an early period and are to be found in the laws of most commercial states. The obligation on the captain to take a pilot, or be responsible for the damages that might ensue, was prescribed in the Roman Law.
 
 *
 
 The Hanseatic ordinances, about 1457, required the captain to take apilot under the penalty of a mark of gold. The maritime law of Sweden, about 1500, imposed a penalty for refusing a pilot of 150 thalers, one-third to go to the informer, one third to the pilot who offered, and the residue to poor mariners. By the maritime code of the
 
 Pays Pas
 
 the captain was required to take a pilot under a penalty of 50 reals, and to be responsible for any loss to the vessel. By the maritime law of France, ordinance of Louis the XIV, 1681, corporal punishment was imposed for refusing to take a pilot, and the vessel was to pay 50 livres, to be applied to the use of the marine hospital and to repair damages from stranding. In England (3 George I, ch. 13), if a vessel were piloted by any but a licensed pilot, a penalty of
 
 £20
 
 was to be collected for the use of superannuated pilots, or the widows of pilots. In the 'United States, provisions, more or less stringent, requiring the payment of a sum when no pilot is taken, are to be found in the statutes of ten of the ¿States. The earliest of these statutes is that of Massachusetts of 1783, and the latest, to which our attention has been called, the statute of New York here under consideration.
 

 
 *240
 
 But, conceding that this provision is a regulation of commerce and within the power of Congress upon that subject, it by no means follows that it involves the constitutional conflict insisted upon by the counsel for the petitioner. In the complex system of polity which prevails in this country the powers of government may be divided into four classes.
 

 Those which belong exclusively to the States.
 

 Those which belong exclusively to the National government.
 

 Those which may be exercised concurrently and independently by both.
 

 Those which may be exercised by the States, but only until Congress shall see fit to act upon the subject. The authority of the State then retires and lies in abeyance until the occasion for its exercise shall recur.
 

 The commercial power lodged by the Constitution in Congress is, in part, of this character. Some of the rules prescribed in the exercise of that power must, from the nature of things, be uniform throughout the country. To that extent the power itself must, necessarily, be exclusive; as much so as if it had been so declared to be, by the organic law, in express terms. Others may well vary with the varying circumstances of different localities. In the latter contingency the States may prescribe the rules to be observed until Congress shall supersede them; the Constitution and laws of the United States in such case, as in all others to which they apply, being the supreme law of the land. This subject, in some of its aspects, was fully considered in
 
 Gilman
 
 v.
 
 Philadelphia.
 

 *
 

 What is there said need not be repeated. In that case it was held that the State of Pennsylvania might competently authorize a bridge to be built across the Schuylkill River in that city, but that Congress, in the exercise of its paramount power, might require it to be removed, and prohibit and punish the erection of like structures, whenever it was deemed expedient to do so. It is the exercise, and not the existence, of the power that is effectual and exclusive.
 

 
 *241
 
 The Constitution took effect on the first "Wednesday of March, 1789. Pilot laws existed in several of the States at that time, and -were subsequently enacted in others. In all such States, it is believed, they have been changed from time to time according to the will of their Respective legislatures. Suits in the State courts have been founded upon them and recoveries had, and many such cases are reported. In none of them have we found that the question was raised, or a doubt expressed, as to the validity of the laws or the authority of the States to enact them.
 
 *
 

 The legislation of Congress upon the subject is as follows: The 4th section of the act of August 7th, 1789,
 
 †
 
 provided that pilots should be regulated by the existing laws of the States, or such as the States should thereafter enact, “ until further legislative provision should be made by Congress.” Whatever may be the effect of the provision looking to future State legislation, it is clear that the body which passed the section did not doubt the power of the States to legislate upon the subject. This was the first Congress which sat under the Constitution, and many of its members were members of the Convention which framed that instrument. The act of March 2d, 1837,
 
 ‡
 
 declares that a vessel, approaching or leaving a port situate upon waters which are the boundary between two States, may employ a pilot licensed by cither of such States, “ any law, usage, or custom to the contrary notwithstanding.” The act of August 30th, 1852,
 
 §
 
 regulates the appointment of pilots upon certain steamboats, and is a complete system as to the class of vessels to which it applies. The act of June 8th, 1864,
 
 ǁ
 
 regulates the fee to be paid by a pilot for his certificate under the act of 1852. It also requires pilots of'the vessels of the class named to be licensed according to the provisions of that act. The act of July 13th, 1866,
 
 ¶
 
 declares that no regulation shall be
 
 *242
 
 adopted by any State making a discrimination as to the rule of half-pilotage between the vessels therein described, and such existing regulations were thereby annulled. The act of February 25th, 1867,
 
 *
 
 contains a pilot regulation touching the sea-going vessels there described, with a proviso that certain State regulations should not be thereby affected. The act of July 25th, 1866,
 
 †
 
 provides for the revocation of the pilot’s license for the offences specified. These several acts assert and exercise the plenary power of Congress over the subject. This early and long-continued practical construction of the Constitution by both National and State authorities, as affecting the validity of the statutory provision here in question, if a doubt could otherwise exist upon the subject, would be entitled to the gravest consideration.
 

 The precise question we are considering came before this court in
 
 Cooley
 
 v.
 
 The Board of Wardens of the City of Philadelphia.
 

 ‡
 

 The suit was for half-pilotage under a statute of Pennsylvania, substantially the same, in this particular, with the statute of New York. The plaintiff' recovered in the lower court, and the Supreme Court of the State affirmed the judgment. The case was brought here for review by a writ of error under the 25th section of the Judiciary Act, and was argued with exhaustive learning and ability. This court, after the fullest consideration of the subject, also affirmed the judgment. We are entirely satisfied with that adjudication, and reaffirm the doctrines which it lays down. It is conclusive upon this branch of the ease before us.
 

 The other objections taken to the judgment relate to the jurisdiction of the court. It is said there is no jurisdiction in admiralty to maintain a libel for a penalty. It was not a penalty that was recovered. There was a tender of services upon which the law raised an implied promise to pay the amount specified in the statute.
 
 §
 
 Courts of admiralty have undoubted jurisdiction of all marine contracts and torts.
 
 ǁ
 
 
 *243
 
 That contracts relating to pilotage are within the sphere of the admiralty jurisdiction has not been controverted by the counsel for the petitioner. The question is not an open one in this court.
 
 *
 

 It is urged further that a State law could not give jurisdiction to the District Court. That is true. A State law cannot give jurisdiction to any Federal court; but that is not a question in this case. A State law may give a substantial right of such a character that where there is no impediment arising from the residence of the parties, the right may be enforced in the proper Federal tribunal whether it be a court of equity, of admiralty, or of common law. The statute in such cases does no.t confer the jurisdiction. That exists already, and it is invoked to give effect to the right by applying the appropriate remedy. This principle maybe laid down as axiomatic in our National jurisprudence. A party forfeits nothing by going into a Federal tribunal. Jurisdiction having attached, his case is tried there upon the same principles, and its determination is governed by the same considerations, as if it had been brought in the proper State tribunal of the same locality.
 
 †
 
 In no class of cases has the application of this principle been sustained by this court more frequently than in those of admiralty and maritime jurisdiction.
 
 ‡
 

 Application for writ denied and petition dismissed.
 

 *
 

 Digest, Book 19, tit. 2, Edict of Ulpian, I, 110; in the Laws of Oleron, I, 232; in the Consulate de Mer, II, 250; and in the Maritime Law of Denmark, III, 262 (Pardessus).
 

 *
 

 3 Wallace, 713.
 

 *
 

 4 Metcalf, 416; Smith
 
 v.
 
 Swift, 8 Id. 329; Martin
 
 v.
 
 Hilton, 9 Id. 371; Nickerson
 
 v.
 
 Mason, 13 Wendell, 64; Low
 
 v.
 
 Commissioners of Pilotage, R. M. Charlton, 307; Matthew Hunt
 
 v.
 
 Mickey, 12 Metcalf, 346.
 

 †
 

 1 Stat. at Large, 54
 

 ‡
 

 5 Id. 153.
 

 §
 

 10 Id. 63.
 

 ǁ
 

 13 Id. 120
 

 ¶
 

 14 Id. 93.
 

 *
 

 14 Id. 412.
 

 †
 

 Ib. 227.
 

 ‡
 

 12 Howard, 299.
 

 §
 

 Commonwealth
 
 v.
 
 Ricketson, 5 Metcalf, 419; Steamship Co.
 
 v.
 
 Joliffe, 2 Wallace, 450; Cooley
 
 v.
 
 The Board of Wardens, 12 Howard, 312.
 

 ǁ
 

 The Belfast, 7 Wallace, 624; Ins. Co.
 
 v.
 
 Dunham, 11 Id. 29.
 

 *
 

 Hobart et al. v. Drogan et al., 10 Peters, 120.
 

 †
 

 Robinson
 
 v.
 
 Campbell, 3 Wheaton, 223; United States
 
 v.
 
 Knight, 14 Peters, 315; Steamboat Orleans v. Phœbus, 11 Id. 184; Thompson v. Phillips, 1 Baldwin, 272, 204; Lorman v. Clarke, 2 McLean, 568; Ex parte Biddle, 2 Mason, 472; Johnston
 
 v.
 
 Vandyke, 6 McLean, 423; Prescott v. Nevers, 4 Mason, 327; Clark v Sohier, 1 Woodbury & Minott, 368.
 

 ‡
 

 The St. Lawrence, 1 Black, 522; The General Smith, 4 Wheaton, 438; Peyroux v. Howard, 7 Peters, 324; Rules of Practice in Admiralty, established by this court, Nos. 12 and 92.