THE ALCALDE, (GUNDERSON, Libelant.)

(*District Court, D. Oregon.* March 1, 1887.)

1. PILOT—COLUMBIA RIVER.

   The power to regulate pilots and pilotage on the Columbia river is permitted to Oregon until congress exercises the same, and is directly conferred by congress on the legislature of Washington. Therefore the state and territory have equal powers over the subject, and may appoint pilots for the river, and prescribe their duties and compensation as to any and all vessels bound in or out of the same, without reference to the fact of whether the business or commerce in which they are engaged pertains to Oregon or Washington; and neither can require that the legislation of the other shall conform to its own in any respect.

2. SAME—QUALIFICATION AND AUTHORITY.

   The warrant of a Washington pilot, granted to him by the commissioners of pilots, is sufficient authority for his tender of service to any vessel bound in or out of the Columbia river; and in a suit to recover half pilotage on such offer, and a refusal thereof, it cannot be shown, as a defense thereto, that the pilot does not keep a sufficient boat on the bar to cruise for vessels, or to supply vessels in distress with provisions and water; and any failure or dereliction in this respect can only be inquired into before the commissioners, who may, in a proper case, deprive the pilot of his warrant.

(*Syllabus by the Court.*)

Suit for Pilotage.
*C. E. S. Wood,* for plaintiff.

*C. B. Watson* and *W. S. Newbury*, for claimant.

DEADY, J. This suit is brought by the libelant, C. S. Gunderson, against the schooner Alcalde to enforce the payment of $28, alleged to be due him as half pilotage under the law of Washington Territory. It appears from the pleadings and evidence that the Alcalde is an American vessel of over 100 tons burden, engaged in the coasting trade between San Francisco and Astoria, and that on August 9, 1886, while so engaged, she was off the bar of the Columbia river, two miles south of the whistling buoy, bound in for Astoria, when the libelant, then on board the steam-tug Columbia, hailed her, and offered to pilot her in over the bar to Astoria, which offer the master declined, and went in, drawing eight feet of water, without a pilot; that the libelant was then a duly licensed pilot for the bar of the Columbia river, under the law of Washington Territory, and was thereby authorized to take charge of and pilot all vessels bound in or out of the Columbia river, and to demand and receive for such service $8 per foot draught for the first 12 feet. The law of the territory, however, permits any master to pilot in his own vessel, but in such case he must pay the pilot who first offers his services half pilotage; and vessels "under 100 tons burden, engaged in the coasting trade," shall not be compelled to pay pilotage at all.

In his answer, the master and claimant, Peter Crack, makes these two defenses to the suit: (1) The steam-tug on which the libelant was when he made the offer of pilot service was not a boat "kept" by the libelant, or other pilots, "as a pilot-boat to cruise outside of the bar of the Columbia river as by law required," but that said tug is "the private property of other parties not pilots," and "is licensed and enrolled and used exclusively for towing," and "is not known or equipped" or entitled to be recognized as a pilot-boat under the pilot-laws of Washington Territory. (2) The Alcalde, on August 9, 1886, and for more than a year before, was duly licensed and enrolled at San Francisco for the coasting trade, in which she was exclusively engaged between said last-named place and Astoria; "and by reason thereof is exempt from compulsory pilotage under and by virtue of the laws of Oregon in such cases made and provided."

It is true that by the law of Oregon (Sess. Laws 1882, p. 20) coasting vessels bound in or out of the Columbia river are exempt from compulsory pilotage, without reference to their tonnage; and it is equally true that the law of Washington only exempts vessels so engaged from such pilotage when they are of less than 100 tons burden. Oregon has no exclusive jurisdiction over the subject of pilots or pilotage on the Columbia river. The stream, for all the purposes of commerce, both domestic and foreign, including pilots and pilotage, is a navigable water of the United States. In the absence of legislation by congress, the state may pass laws regulating pilots and pilotage thereon, and the territory may do the same. *The Glenearne*, 7 Sawy. 202, 7 Fed. Rep. 604. The organic act (10 St. 172) declares that the legislative power of Washington "shall extend to all rightful subjects of legislation not inconsistent with

the constitution and laws of the United States." Pilots and pilotage are beyond question rightful subjects of legislation, and were so regarded as early as the third century. *Ex parte McNiel*, 13 Wall. 239. Congress has plenary power over the subject as well in the territories as the states, and may delegate the same to the territorial legislature. *The Panama*, 1 Deady, 31. It follows that the power of the state over pilots and pilotage is limited to pilots appointed by it and acting under its laws; and it has no power to regulate the conduct or compensation of pilots holding commissions under the laws of Washington Territory; nor to exempt any vessel entering the Columbia river from the authority or demands of said pilots.

Nor is it at all material that the Alcalde was engaged in the coasting trade only. The subject of pilots and pilotage includes, in this respect, authority over all vessels that enter or leave the port, or navigate the water defined by law or usage as the pilot ground. Whether any or all vessels shall be exempt from compulsory pilotage is a question for the respective legislatures of the state and territory. Since 1882, Oregon has seen proper to exempt vessels engaged in the coasting trade from paying half pilotage to her pilots for an offer of service which is declined; while Washington has limited the exemption, in the case of her pilots, to vessels of less than 100 tons burden.

Neither is it material that the Alcalde was bound to Astoria, a port on the Oregon side of the river. The Columbia, and all the ports on it, are navigable waters of the United States, and neither the state nor the territory has any exclusive jurisdiction over them in the matter of pilotage. Either may authorize or maintain pilots thereon, and prescribe their duties and compensation, subject to the act of congress of 1837, (section 4236, Rev. St.,) which enacts that the master of any vessel "coming or going out of any port situate on the waters which are the boundary between two states," may "employ any pilot duly authorized or licensed by the laws" of either of said states "to pilot said vessel to or from said port."

The question of whether Washington is a "state" within the meaning of this act does not necessarily arise in this case; for it is not claimed that the Alcalde took on an Oregon pilot after the offer from the libelant. See *The Ullock*, 9 Sawy. 641, 19 Fed. Rep. 207; *The Abercorn*, 26 Fed. Rep. 877, and 28 Fed. Rep. 384.

The offer of the Washington pilot stands, then, in my judgment, in the same light as if there were no Oregon pilots licensed for this water. Oregon has no more right to enact laws for the Columbia river than Washington has. The master of the Alcalde having made no choice between the pilots of the two countries, but contented himself with the refusal of the libelant, such offer and refusal must have effect according to the law of Washington, under which they took place.

Pennsylvania and Delaware are coterminous states, situate on the same navigable water, which is not, however, a separating boundary between them. The case of *The Clymene*, 9 Fed. Rep. 164, grew out of an attempt on the part of the former state to prevent the pilots of the latter

from piloting vessels entering the Delaware bay to the port of Philadelphia, on the ground that the port was within the state, and therefore its exclusive jurisdiction. The claim was disregarded, and the case decided to be within the meaning and purpose of the act of 1837, although the river was not the boundary between the two states, because they were coterminous states situate thereon. The decision was affirmed in the circuit court. *The Clymene*, 12 Fed. Rep. 346. In the district court, Mr. Justice BUTLER, speaking generally of the claim of Pennsylvania to have exclusive jurisdiction of pilotage for the port of Philadelphia and its commerce, said:

"The relations of the states as members of the general government—the fact that they are not separate independencies, and that the navigable waters within their respective limits are subject to common use—must be constantly kept in view. The commerce on the Delaware bay and river, no matter where from or where bound, does not belong to Pennsylvania. That she and her citizens derive a larger share of benefit from it than her neighbors is her good fortune, but it confers no right on her to say who shall enter a port within her limits, or what pilot shall be employed. The port itself, constituted of the public waters of the nation, is not hers; and it is but by the grace of the general government that she is allowed any independent voice respecting it."

As to the other defense, a few words will suffice. The law of Washington Territory, under which the libelant acted, provides for a board of pilot commissioners, and gives them the exclusive authority to examine and license pilots for the Columbia river and bar. Each pilot is required to give bond in the sum of $5,000; and "the pilots" are required "to keep a sea-worthy boat of not less than forty tons burden, full-decked, to cruise outside the bar," and, in default thereof, shall be deprived "of their warrants by the pilot commissioners." They are also required to carry provisions and water for the aid of vessels in distress. It appears that the steam-tug Columbia is a full-decked vessel, of 70 tons burden, propelled by steam, used for both towing and pilotage on the bar of the Columbia river; that she is owned by private parties, not pilots, and the libelant gets from her owners $100 a month for his compensation or share of the earnings.

The claimant contends that this is not a compliance with the law of Washington on the subject of keeping a boat. But is this contention well founded? And, first, it is to be observed that the pilots are not required "to own" a pilot-boat, but only "to keep" one. It makes no difference who owns the boat, so they have the use of her for pilot purposes. Nor is it an objection that she is propelled by steam rather than sails, but the contrary; or that she is engaged in towing also, unless she is thereby prevented from putting a pilot on board a vessel in due time. Again, the pilots may compensate the owner of the tug for her use or service in any way the parties may agree on. For instance, they may put the sums received for pilotage and towage into a common fund, and divide it on some prearranged basis, or they may agree that the pilot shall have so much a month in any event. These are matters which do not concern the parties to whom pilot service is tendered; and it is not

apparent why such an arrangement is not a substantial and even a full compliance with the law.

But I am satisfied that the question of whether a pilot is complying with the law in keeping a sufficient boat for pilot purposes can only be made before the commissioners. Indeed, it matters not to the master of a vessel to whom a pilot offers his services on the pilot ground how he gets there. He may have trusted to a canoe, or even swam out. If he is on the ground, and ready and capable of taking charge of the vessel, that is all the master can require. In the case of *The Panama*, 1 Deady, 33, the question was mooted, but not actually decided, whether, in a suit for pilotage, it could be set up as a defense that the libelant did not keep a sufficient boat on or outside the bar to cruise for vessels. In dismissing the question, the court said: "The legislature has confided the administration of the law in these matters to the pilot commissioners."

The commissioners have the power to deprive a pilot of his warrant for inattention to his duty, or a failure to provide or keep a sufficient boat wherewith to perform the same. The statute has expressly conferred this authority on them, and it is contrary to all the analogies of the law that a dereliction in this respect should be inquired of collaterally or elsewhere. Indeed, it would be intolerable and interminable if, in every suit for half pilotage, the libelant could be required to show to the satisfaction of the court that he had kept a sufficient boat on the bar, sufficiently supplied with "provisions and water" for the aid of vessels in distress.

The fact is, I suppose, that the resistance in this and other cases to the employment of Washington pilots is carried on in the interest of the state pilots at Astoria, who seem to assume that, because the commerce of the Columbia river belongs mainly to Oregon, Washington ought not to be allowed to maintain pilots thereon, or to make any rules or regulations in the matter of pilotage different from those of Oregon. But, as neither Oregon nor Washington have any power over the subject except what is permitted to them by congress, neither can require that the legislation of the other shall be conformed to its own, or be confined to the commerce pertaining to the ports thereof. The only mode of securing uniformity of regulation is by an appeal to congress, with whom the ultimate control of the whole subject rests.

There must be a decree for the libelant for the amount sued for, with interest from the filing of the libel, and costs and disbursements; and it is so ordered.