BIGLEY v. NEW YORK & P. R. S. S. CO. HUUS v. SAME. TORGESON v. HAY.

(District Court, S. D. New York. November 10, 1900.)

1. PILOTS—OBLIGATION TO TAKE—FOREIGN PORTS.

In Consol. Act N. Y. 1882, § 2119, which requires domestic vessels navigating under a coasting license from the United States to take a licensed pilot on entering or departing from the port of New York, only when such vessels are from a foreign port, whether the words "foreign port" mean a port within the sovereignty and dominion of a foreign nation, quære.

2. SHIPPING—LICENSE FOR COASTING TRADE—PORTO RICAN PORTS.

Section 9 of the Porto Rico act of April 12, 1900 (31 Stat. 79), which provides for the nationalization of all vessels owned by the inhabitants of Porto Rico, and for their admission to all the benefits of the coasting trade of the United States, and that "the coasting trade between Porto Rico and the United States shall be regulated in accordance with the provisions of law applicable to such trade between any two great coasting districts of the United States," extends and makes applicable the privileges and restrictions of the coasting trade of the United States not only to trade, but also to navigation between the ports of Porto Rico and those of the United States; the words "coasting trade" having been used and construed as extending to the navigation by means of which such trade was carried on in the Alaskan act of 1868.

3. PILOTS—OBLIGATION TO TAKE—VESSELS FROM PORTO RICAN PORTS EXEMPTED.

Rev. St. § 4444, exempts all steam vessels sailing under license from the United States, and employed in the coastwise trade, from the pilotage laws of the states. Consol. Act N. Y. 1882, § 2119, requiring foreign vessels and vessels from a foreign port to take a licensed pilot on entering or departing from the harbor of New York, exempts from its provisions do-

mestic steam vessels licensed and engaged in the coasting trade. *Held* that, under the provisions of either statute, domestic steam vessels, licensed by the United States since the passage of the Porto Rico act of April 12, 1900, and entering the port of New York from Porto Rican ports, were exempted from the payment of pilotage charges imposed by the state statute.

In Admiralty. Suits to recover for pilotage services offered and refused.

Lindsay, Kremer, Kalish & Palmer, for libelants.
Curtis, Mallet-Prevost & Colt, for New York & P. R. S. S. Co.
Cowen, Wing, Putnam & Burlingham, for Hay and others.

BROWN, District Judge. In the above three libels pilotage dues are claimed for services offered and rejected as follows:

(1) June 2, 1900, from the steamship Ponce outward bound from New York to Porto Rico, $60.06.

(2) June 25, 1900, same steamer inward bound from Porto Rico to New York, $74.34.

(3) July 24, 1900, for the schooner O. F. Whittier inward bound from San Juan, Porto Rico, $37.54.

From the agreed statement of facts it appears that the vessels were all American vessels sailing under coasting licenses duly issued since the act of April 12, 1900 (31 Stat. 79, c. 191, § 9); and it is agreed that the libelants are entitled to the pilotage dues above specified, provided that the vessels at the above dates were bound to or from a "foreign port" and were not "engaged or employed in the coasting trade."

1. Pilotage fees, as regulations of commerce, are wholly subject to the constitution and laws of the United States. By section 4235 of the United States Revised Statutes, embodying the provisions of the act of August 7, 1789, it is enacted that "until further provision is made by congress all pilots * * * in the ports of the United States shall continue to be regulated in conformity with the law of the states."

By section 4401, it is enacted that every coastwise seagoing steam vessel of the United States shall, "when under way, excepting on the high seas, be under the control and direction of pilots licensed by the inspectors of steam boats."

By section 4443, the master or mate may also be licensed as a pilot; and by section 4444, the states are forbidden to require any other license in addition to those issued by the United States, or to impose any other regulation which shall impede such pilots from the performance of their duties. The same section also further provides:

"Nor shall any pilot charges be levied by any such (state) authority upon any steamer piloted as provided by this title. Nothing in this title shall be construed to annul or affect any regulation established by the laws of any state requiring vessels entering or leaving a port of any such state, other than coastwise steam vessels, to take a pilot duly licensed by the laws of such state."

The effect of the above acts of congress, is to exempt all steam vessels sailing under a license and employed in the coastwise trade from the pilotage laws of the states; while other vessels remain subject to the state laws.

By section 2119 of the New York consolidation act of 1882 relating to pilotage it is provided:

"No master of any vessel navigated under a coasting license and employed in the coasting trade by way of Sandy Hook shall be required to employ a licensed pilot when entering or departing from the harbor of New York. * * *

"All masters of foreign vessels and vessels from a foreign port, and all vessels sailing under registry bound to or from the port of New York by the way of Sandy Hook, shall take a licensed pilot. * * *

"This section shall not apply to vessels propelled wholly or in part by steam owned or belonging to citizens of the United States and licensed and engaged in the coasting trade."

Although the maintenance of a body of skillful pilots is regarded as a matter of public policy in the interests of commerce, and though the laws in regard thereto are to be construed liberally for their benefit (Ex parte McNiel; 13 Wall. 236, 20 L. Ed. 624; Gillespie v. Winberg, 4 Daly, 318, 325), still no suit can be maintained for such fees, except in accordance with the statutory provisions applicable to the specific case. As each of these vessels is a domestic vessel and was navigated under a coasting license of the United States no pilotage can be claimed under the provisions of section 2119 of the New York statute above quoted, if the vessel was in fact "employed in the coasting trade"; nor second, unless she was "from a foreign port."

2. The primary and ordinary meaning of the term "foreign" is, belonging to or relating to another sovereignty or dominion; as in the expressions "foreign law," "foreign commerce," "foreign ministers," "foreign territory." In the case of The Eliza, 2 Gall. 4, 7, Fed. Cas. No. 4,346, Story, J., says:

"It is clear to my mind that a foreign port or place under the statute means a port or place exclusively within the sovereignty of a foreign nation. Such has been the uniform construction," etc.

In U. S. v. Hayward, 2 Gall. 485, 500, Fed. Cas. No. 15,336, he says:

"By 'foreign ports,' as the terms are here used, may be understood a port within the dominion of a foreign sovereign and without the dominion of the United States."

See, also, The Lark, 1 Gall. 55; Fed. Cas. No. 8,090; The Sally, 1 Gall. 58, Fed. Cas. No. 12,257; The Adventure, 1 Brock. 235, Fed. Cas. No. 93; Taber v. U. S., 1 Story, 1 Fed. Cas. No. 13,722; Loughborough v. Blake, 5 Wheat. 317, 5 L. Ed. 98.

In this sense of the word, it is evident that Porto Rico, since the cession of the island by Spain to the United States, is not a foreign port, as it is subject solely to the sovereignty and dominion of this country.

By the treaty with Spain of April 11, 1899 (30 Stat. 1754, art. 2):

"Spain cedes to the United States the island of Porto Rico and other islands now under Spanish sovereignty in the West Indies, and the island of Guam in the Marianas or Ladrones."

Article 9 of the same treaty provides:

"The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States, shall be determined by congress."

The term "foreign" is familiarly used also in a more restricted sense in our interstate law in such phrases as "foreign corporation,"

"foreign divorce," "foreign assignment," "foreign judgment," etc. But the word, even in this use of it, still retains its primary significance, and refers to the independent jurisdiction and authority of the several states over the subject-matter referred to. In the same sense vessels belonging to citizens of another state, are often termed "foreign vessels," and are treated as such in the federal courts in the application of the maritime law as respects maritime liens for work, materials and supplies; and conversely, supplies furnished a vessel in a different state from that of her owner's residence, i. e. not in the home port, are treated as supplied in a "foreign port." This designation of ports of other states as "foreign ports" as respects maritime liens, originated in colonial times, when the colonial governments were independent of each other; and the law has remained unchanged in that regard between the states since the Union under the constitution. But the words "a foreign port" in the New York pilotage statutes are evidently not used in this restricted sense, and do not embrace ports of any of the states. For interstate navigation is embraced in the "coasting trade," in which pilotage charges are expressly excluded.

When the New York statute was enacted, however, it evidently applied to vessels bound to or from Porto Rico and so continued, at least until its cession to us by Spain; and it is urged that until the laws applicable to Porto Rico were changed by congress, the liability to pay pilotage remained as before. No doubt where territory is acquired by conquest or by treaty, the laws existing among the people of the territory, in the absence of treaty stipulations, continue in force until altered by the new sovereign. Otherwise, until the new sovereign should act, the territory would be without any law at all. Strother v. Lucas, 12 Pet. 410, 436, 9 L. Ed. 1137; Railway Co. v. McGlinn, 114 U. S. 542, 546, 5 Sup. Ct. 1005, 29 L. Ed. 270. Most of our acquisitions by treaty have contained provisions securing certain rights to the people of the territory. By the treaty with Spain all these rights were expressly left to the action of congress. Until congress acted, therefore, and except as modified through the military power, the law of the internal relations at least of the people of Porto Rico remained as before; and it may be that their external relations as respects this country in matters of navigation and commerce also remained the same. See Goetze v. U. S. (C. C.) 103 Fed. 72, and cases there cited.

3. I do not find it necessary, however, to determine this question, since the act of congress of April 12, 1900 (31 Stat. 79, c. 191, § 9), in pursuance of the terms of the treaty, and acting under its constitutional power, shows so clear an intention to alter the previous conditions, and to assimilate trade and navigation between Porto Rico and the United States to the ordinary coasting trade between ports of the United States, that pilotage cannot now be claimed in the one case more than in the other. That act provides for a government of the island, not only in its internal relations, but also as respects trade and commerce. The whole machinery of a new government was provided for; officers executive and judicial were to be appointed, and oaths of fidelity to the United States to be exacted;

ports of entry were established and revenue for necessary expenses to be collected by customs duties; vessels of the Porto Ricans were allowed to become nationalized, and by necessary implications from the provisions of section 9, the rules and regulations of our domestic coasting trade were designed to be made applicable to trade and commerce between the United States and Porto Rico. The act is entitled: "An act temporarily to provide revenues and a civil government for Porto Rico and for other purposes."

Section 9, having special reference to trade and commerce with this country, provides as follows:

"Sec. 9. That the commissioner of navigation shall make such regulations, subject to the approval of the secretary of the treasury, as he may deem expedient for the nationalization of all vessels owned by the inhabitants of Porto Rico on the eleventh day of April, eighteen hundred and ninety-nine, and which continued to be so owned up to the date of such nationalization, and for the admission of the same to all the benefits of the coasting trade of the United States; and the coasting trade between Porto Rico and the United States shall be regulated in accordance with the provisions of law applicable to such trade between any two great coasting districts of the United States."

The great coasting districts of the United States are established by section 4348 of the Revised Statutes. The first and second districts embrace the sea coast and navigable rivers from the eastern limit of the United States to the Rio Grande; and the evident intention of section 9, as it seems to me, is to extend and make applicable the privileges and the restrictions of the coasting trade of the United States to trade and navigation between the United States and Porto Rico, the same as if they formed contiguous territory.

It is objected that the phraseology of the statute covers only trade, and does not include navigation, or the laws applicable to navigation. In the construction of a statute of this general character, however, such a verbal distinction seems to me not well founded; and inasmuch as the "coasting trade between the United States and Porto Rico" can only be carried on by means of vessels and the navigation of vessels, "the provisions of law applicable to such trade," in the language of section 9, must include the laws applicable to the navigation by which alone such coasting trade can be carried on.

No doubt the words "coasting trade" as thus construed are extended beyond their original and primary significance, which meant trade along the contiguous line of coast of the United States. But the whole subject being within the power of congress, it is competent for congress to extend the privileges and restrictions of that trade as it shall see fit; and the only question is whether that extension was intended in this act. Upon the acquisition of Alaska, the same terms were used and in the same manner for the extension of the "coasting trade" between the United States and that territory far beyond any contiguous coast line of the United States (Act July 27, 1868; Rev. St. § 4358), and in the act of April 30, 1900, to provide a government for the territory of Hawaii (31 Stat. 141, 161, c. 339, § 98), there is also provision for the "coasting trade between the Hawaiian Islands and any other portion of the United States," in the same language that is employed in the last clause of section 9. This extended use of the words "coasting trade" was already familiar.

Numerous decisions of the commissioner of navigation as respects trade and navigation by American vessels between these territories and the United States have, moreover, held such trade to be a part of the coasting trade of the United States, entitling the vessels to sail under enrollments and licenses with the privileges and exemptions attaching thereto (Dec. 6,106, Jan. 8, 1884; also Decs. 5,618, 18,859, 19,364, 22,201, May 3, 1900); and the same has been ruled by the commissioner with regard to trade with Porto Rico since the act of April 12, 1900, by treasury decision 22,232, May 16, 1900. It was under these rulings that the registers of these vessels were surrendered and coasting licenses taken out.

The decisions of the commissioner of navigation under the direction of the secretary of the treasury are official decisions entitled to much weight, since he is an officer "specially charged with the decision of all questions relating to the issue of registers, enrollments and licenses of vessels." Act July 5, 1884 (1 Supp. Rev. St. p. 461).

His decisions on these points are the more important from the fact that by section 4337 of the Revised Statutes, it is enacted that "if any vessel enrolled or licensed shall proceed on a foreign voyage without first giving up her enrollment and license, * * * and being duly registered by the collector, such vessel and the merchandise so imported therein shall be liable to seizure and forfeiture."

The distinction, therefore, between foreign voyages, which can be made only by registering the vessel, and the coastwise trade in which vessels may be navigated under license, is vital. If the voyages between Porto Rico and New York which these vessels were making under license in accordance with the commissioner's decisions, were foreign voyages, the vessels and their cargoes were liable to seizure and forfeiture for sailing under license, instead of being registered.

It is urged that section 9 does not expressly state that trade between Porto Rico and the United States shall be deemed or treated as "coasting trade," and that the word "coasting" before the word "trade" in the last sentence of section 9 is not an appropriate word, nor sufficient to indicate that such was the intent of congress. It seems to me otherwise; and that the designation of such trade as "coasting trade" is as strong by necessary implication as a direct affirmance would be. For otherwise the whole provision, as far as I can see, would have no meaning. The clause is an indirect affirmance of a "coasting trade" to be established "between Porto Rico and the United States"; it is that trade between Porto Rico and the United States which is to be governed by the rules applicable to the great coasting districts of the United States; and any such trade that is possible "between Porto Rico and the United States" must necessarily include voyages like the present, which are therefore entitled to the same exemptions as the established great coasting districts of the United States. Such has been the established construction and the practice under a similar statute respecting "coasting trade" with Alaska for more than 30 years past. The identity of the phraseology on this subject in the acts as to Alaska and Porto Rico shows that congress in framing section 9, had in view the Alaskan statute, and must, therefore, have intended that

the same construction and effect should be given to section 9 which the practice and usage for 30 years under the Alaskan statute had already established.

For the above reasons, I think these vessels were not liable to pilotage charges, and the libels must be dismissed, with costs.