William J. BAESZLER, Plaintiff,

v.

MOBIL OIL CORPORATION,
Defendant.

No. 71 Civ. 4977 E.L.P.

United States District Court,
S. D. New York.

Nov. 30, 1973.

Healy & Baillie, New York City, for plaintiff; John C. Koster, New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for defendant; John S. Rogers, New York City, of counsel.

PALMIERI, District Judge.

### Introduction

■ These are cross-motions for summary judgment. Fed.R.Civ.P. 56(a) and (b). Plaintiff sues to recover allegedly compulsory pilotage fees amounting to $915.60 for services tendered to defendant in New York harbor. There is no issue as to any material fact. For the reasons hereinafter set forth, judgment is entered for the defendant. As a suit for compulsory pilotage fees pursuant to state law(s), this case comes within the admiralty jurisdiction of this Court. Hobart v. Drogan, 35 U.S. (10 Pet.) 108, 119–120, 9 L.Ed. 363 (1836); Ex Parte McNiel, 80 U.S. (13 Wall.) 236, 242–243, 20 L.Ed. 624 (1872); Reardon v. Arkell, 59 F. 624, 625–626 (S.D.N.Y.1894); Fordham v. Munson S. S. Line, 6 F.Supp. 435 (S.D.N.Y.1933).

### There Are No Genuine Issues of Fact

■ Fed.R.Civ.P. 56(c) provides that a moving party may be entitled to judgment as a matter of law only if there is no genuine issue as to any material fact. Plaintiff argues that there are no such issues. While the defendant argues that there are a number of factual issues, they are not a bar to the relief granted since the issues raised by defendant all pertain to its affirmative defenses.[1] They might have served

---

1. Walling v. Richmond Screw Anchor Co., 154 F.2d 780, 784 (2d Cir. 1946), cert. denied, 328 U.S. 870, 66 S.Ct. 1383, 90 L.Ed. 1640 (1946); Amaya v. Stanolind Oil & Gas Co., 62 F.Supp. 181, 206 (S.D.Tex.1945), aff'd, 158 F.2d 554 (5th Cir. 1946), cert. denied, 331 U.S. 808, 67 S.Ct. 1191, 91 L.Ed. 1828, rehearing denied, 331 U.S. 867, 67 S.

as a bar to summary judgment in favor of plaintiff, but clearly no such problem is presented here because defendant would prevail in any event. It follows that under these circumstances the case is in a posture appropriate for summary judgment. *Cf.* Scolnick v. Lefkowitz, 329 F.2d 716, 717 (2d Cir. 1964); Dressler v. MV Sandpiper, 331 F.2d 130, 132–133, 134 (2d Cir. 1964); Waldron v. British Petroleum Co., 38 F.R.D. 170, 173–174 (S.D.N.Y. 1965), aff'd, 361 F.2d 671 (2d Cir. 1966), aff'd sub nom., First National Bank v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

## The Factual Background

Plaintiff is a duly licensed New Jersey Sandy Hook pilot who tendered his services during the summer of 1971 to three vessels of which defendant is the owner or consignee. Each of the three vessels was bound from Stapleton Anchorage in New York harbor, just north of the Verranzano Narrows Bridge, to Port Mobil, New York, at Staten Island, by way of a route through the Ambrose Channel heading southeast (generally), crossing over the Sandy Hook Bar area[2] and turning around and coming back into the harbor through the Sandy Hook channel, Raritan Bay Reach, etc., to Port Mobil (formerly Port Socony) on the west side of Staten Island at Arthur Kill. Plaintiff contends that by virtue of crossing the Sandy Hook bar area the vessels became subject to the compulsory pilotage statutes of New Jersey or New York, both states having land areas contiguous to harbor waters and consequently having concurrent jurisdiction over the harbor. Defendant's vessels had initially gone to the Stapleton Anchorage within

the harbor upon arrival from international voyages in order to unload part of their cargoes onto lighters so as to lighten their loads so that the vessels could transverse the shallower channels to Port Mobil. The application of the compulsory pilotage statutes to the initial entries is not in question.

The basis of the dispute turns on the construction of the applicable New Jersey and New York statutes:

N.J.S.A. § 12:8–35 (1968): Vessels required to take pilots

"All masters of foreign vessels and vessels from a foreign port, and all vessels sailing under register, bound in or over the bar of Sandy Hook, shall take a licensed pilot, or in case of refusal to take such pilot, the master, owner or consignee shall pay the pilotage as if one had been employed, and such pilotage shall be paid to the pilot first speaking or offering his services as pilot to such vessel."

N.Y. Navigation Law § 88 (McKinney's Consol.Laws, c. 37, Supp.1973): Pilotage at Sandy Hook, Sands Point or Execution Rocks

"1. Every foreign vessel and every American vessel under register entering or departing from the Port of New York by the way of Sandy Hook, or by the way of Sands Point or Execution Rocks, shall take a Sandy Hook pilot licensed under the authority of this article or of the laws of the state of New Jersey or a person heretofore licensed as a Hell Gate pilot. . . . "

## Federal Statutory Background

Sections 211 and 215 of Title 46 of the United States Code provide that:

§ 211. State regulation of pilots

---

Ct. 1530, 91 L.Ed. 1871 (1947); 6 J. Moore, Federal Practice ¶ 56.13, at 2249 (2d ed. 1965); *cf. id.* ¶ 56.17 [4], at 2491–94.

2. The exact parameters of the "Sandy Hook bar area," a phrase employed here for the sake of convenience, are not strictly defined. A bar is a built up area at the mouth of a river caused by the deposit of sediment

dropped from suspension when the river current slackens as it meets the sea. The location of a bar is not static. However, the exact routes taken by the three vessels are undisputed and there is no substantive question that they crossed the pertinent reference points.

"Until further provision is made by Congress, all pilots in the bays, inlets, rivers, harbors, and ports of the United States shall continue to be regulated in conformity with the existing laws of the States respectively wherein such pilots may be, or with such laws as the States may respectively enact for the purpose."

§ 215. State regulations as to licenses of pilots of steam vessels and pilot charges

" . . . Nothing in title 52 of the Revised Statutes shall be construed to annul or affect any regulation established by the laws of any State, requiring vessels entering or leaving a port in any such State, other than coastwise steam vessels, to take a pilot duly licensed or authorized by the laws of such State, or of a State situate upon the waters of such State."

Section 212 provides that where waterways are bound by more than one state a vessel may employ a pilot of either state.[3]

The Supreme Court has held that the only area of pilotage actually preempted by federal legislation (46 U.S.C. § 215 (1970), *supra*) applies to coastwise steam vessels not sailing under registry, a category undisputedly inapplicable to the vessels here. Anderson v. Pacific Coast S. S. Co., 225 U.S. 187, 199, 32 S. Ct. 626, 56 L.Ed. 1047 (1912) ; *see also* Bigley v. N. Y. & P. R. S. S. Co., 105 F. 74, 75 (S.D.N.Y.1900), question certified to the Supreme Court sub nom., Huus v. N. Y. & P. R. S. S. Co., 109 F. 1058 (2d Cir.), aff'd, 182 U.S. 392, 21 S.Ct. 827, 45 L.Ed. 1146 (1901) ; Fordham v. Munson S. S. Line, *supra,* 6 F.Supp. at 436.

This federal reservation of power, and the terms of §§ 211 and 215, have been regarded as delegating to the states the authority to regulate the pilotage of all other vessels in their ports. Huus v. N. Y. & P. R. S. S. Co., 182 U.S. 392, 394, 21 S.Ct. 827, 45 L.Ed. 1146 (1901) ; Anderson v. Pacific Coast S. S. Line, *supra,* 225 U.S. at 201; Fordham v. Munson S. S. Line, *supra,* 6 F.Supp. at 436; *see generally* Cooley v. Board of Wardens, 53 U.S. (12 How.) 299, 311–321, 13 L. Ed. 996 (1851) ; Ex Parte McNiel, *supra,* 80 U.S. (13 Wall.) at 240–243. This raises a question as to whether the specific language of § 215 designating certain kinds of "vessels entering or leaving a port" as those exempted from federal pilotage actually limits state authority to regulate port pilotage exclusively to entering or departing vessels. However, in view of our conclusion as to the proper construction of the state statutes, we do not reach this issue.

*The New York Statutory Background*

The language of the New York compulsory pilotage statute, N.Y. Navigation Law § 88(1) (McKinney Supp. 1973), clearly and unambiguously applies to certain kinds of vessels coming into or going out of the New York harbor by way of the Sandy Hook bar area.

This conclusion is supported by an examination of some of the unrelated sections of Article 6, the New York statute covering "Pilots and Pilotage Fees."[4] Section 88(2) makes it unlawful for an unlicensed (state) pilot to perform the compulsory pilotage stipulation in § 88(1), and § 88(3) makes such conduct a misdemeanor. The terms of § 88(2) make its prohibition applicable to the same vessels as § 88(1) "sailing . . . to or from the Port of New York, by the way of Sandy Hook. . . ."

Similarly, § 96(1)(a), which makes pilotage fees compulsory for the types of vessels which come within the scope of the compulsory pilotage provisions, e. g.,

---

3. 46 U.S.C. § 212 (1970) :

"The master of any vessel coming into or going out of any port situate upon waters which are the boundary between two States, may employ any pilot duly licensed or authorized by the laws of either of the States bounded on such waters, to pilot the vessel to or from such port."

4. N.Y. Navigation Law, Art. 6, §§ 87–98 (McKinney Supp.1973).

§ 88(1), contains language identical to § 88(1). By the same token § 96(7) imposes liability for payment of pilotage fees on certain persons "entering or clearing the vessel at the port of New York. . . ."[5]

The inclusion of this explicit language in all of these sections relating to compulsory pilotage hardly affords this Court the latitude to infer an intention on the part of the New York legislature to extend the coverage of these sections beyond that which is clearly indicated by their terms.

Section 89–b(1) is the analogue of § 88(1) with respect to the other main entrance to New York, the Long Island and Block Island Sounds. The first sentence of that section provides:

> Every foreign vessel and every American vessel under register transiting the New York state waters of Long Island Sound or Block Island Sound east of Execution Rocks or Sands Point, and any such vessels entering or departing from any port situated on the New York state waters of Long Island Sound east of Execution Rocks or Sands Point, shall take a Long Island-Block Island Sound pilot licensed under the authority of this article or of the laws of any other state having concurrent jurisdiction over these waters.

The same language is used in § 89–b(2), prohibiting unlicensed pilots, and in § 96(8)(a), establishing compulsory pilotage fees.

Moreover, § 96(4) and Regulation 55.1 promulgated pursuant thereto,[6] and § 98, accommodate voluntary, *non-compulsory* use of pilots, presumably in contempla-

tion of intra-harbor shifts of vessels. In fact, plaintiff here is claiming fees computed on the basis of Regulation 55.-1. In view of the limited scope of the compulsory provisions and in light of the available legislative background, it seems clear that these non-compulsory provisions are applicable to intra-harbor shifts.

This leads to the question of whether a crossing of the Sandy Hook bar area removes a vessel from the category of intra-harbor shifts and therefore removes it from the coverage of the non-compulsory aspects of the statute. The true threshold question in this case does not lie in defining an intra-harbor shift *vis-a-vis* the Sandy Hook bar area, but in the definition of "entering or departing from the Port of New York." As to that, all of the available indicia point to a commencement or termination of a voyage.

*The Proposed New York Legislation of 1972*

There can be little doubt that the New York legislature was fully aware of the ramifications of the language in the statute, for in 1972 an amendment to § 88(1) was proposed which dealt directly with the problem that confronts us now.[7] That amendment would have added a clause to the first sentence of § 88(1) which would have resulted in the following:

> "Every foreign vessel and every American vessel under register entering or departing from the Port of New York by way of Sandy Hook, or by the way of Sands Point or Execution Rocks, *or underway within that port, except when maneuvering during*

---

5. Thus defendant's contention that irrespective of all else, liability cannot be imposed on them by virtue of this section because the vessels were not "entering or clearing" at the time of the movement. The New Jersey statute contains an identical provision. N.J.S.A. 12:8–38 (1968).

6. N.Y. Pilotage Regulation 55.1(b) :
"For transporting a vessel from one to the other of any two of the following areas, or within any one of the following areas,

the fee shall be one-half of the rate established by the Navigation Law for the pilotage of vessels entering or departing from the Port of New York by the way of Sandy Hook, or a minimum of $75 : Leonardo, Perth Amboy, Raritan River, Arthur Kill, Kill Van Kull, Newark Bay and tributaries."

7. S. 8962, N.Y. Legislature, 195th Sess. (February 29, 1972).

*the berthing and unberthing opera-*
*tions or shifting within the port with*
*tug assistance and a docking master*
*aboard the vessel,* shall take a Sandy
Hook pilot licensed under the authori-
ty of this article or of the laws of the
state of New Jersey or a person here-
tofore licensed as a Hell Gate pilot."

For reasons which are not readily as-
certainable, the proposed amendment
was not passed. Nevertheless, it does
not seem unreasonable to regard the
proposal as an acknowledgment of the
explicit limitations of the language of §
88(1) and, in addition, it seems equally
reasonable to view the failure of the
amendment as a manifestation of a leg-
islative desire not to expand its cover-
age. This inference is buttressed by the
accompanying "Memorandum in Sup-
port" of the amendment written by its
sponsors.[8] The initial statement in the
Memorandum leaves no doubt about the
relevancy of the proposed amendment to
the case at bar:

"This bill closes a loophole under
which pilots and masters of vessels
not licensed by New York State have
been piloting ships within the Port of
New York and provides that these
vessels when underway within that
Port, except under certain specific cir-
cumstances, should utilize the services
of State licensed pilots."

Moreover, the Memorandum provides
a lucid insight into the sponsors' ap-
praisal of the scope of the current provi-
sion:

"At the present time every foreign
vessel and every American vessel un-
der registry entering the Port of
New York must have a licensed Sandy
Hook pilot on board who directs the
ship to a safe anchorage or a berth
somewhere in the harbor. Likewise,
these ships must utilize a Sandy Hook
pilot upon departing from the Port.
. . ."

"It can, therefore, be seen that the
New York State law does not express-
ly require another pilot to be taken on
board foreign ships or American ships
in foreign trade until the ship is ready
to leave the Port of New York.
. . ."

Thus the New York statutory scheme,
as well as the current legislative under-
standing of the statute, militates in fa-
vor of a literal construction of the un-
ambiguous "entering or departing" lan-
guage of § 88(1).

### The Federal Scheme as Applied to New York

This conclusion also reconciles the
New York statutory scheme with the ap-
parent motivation of Congress in leaving
this area of regulation to the states.
Congress determined that it was infeasi-
ble for it to establish a network of pilots
and boats sufficient to effectuate the
boarding and transfer of federal pilots
from vessels prior to their entering a
port and subsequent to their departure.[9]
However, it did retain jurisdiction over
certain kinds of vessels on kinds of voy-
ages where the logistics could as a prac-
tical matter be accommodated, i. e.,
"coastwise steam vessels." 46 U.S.C. §
215 (1970). Consequently, the primary
justification for the Sandy Hook pilots
can be regarded as their logistic ability
to accommodate incoming and outgoing
vessels. Clearly a strict interpretation
of the statutory language of "entering
or departing from the Port of New
York" comports with this rationale.

### The New Jersey Statutory Background

The term "bound in" as it appears in
the New Jersey compulsory pilotage
statute, N.J.S.A. § 12:8–35 (1968), *su-
pra,* is clear and unequivocal and leaves
little doubt as to its proper construction
and application. Conversely, the phrase
"bound . . . over" is subject to a
broad spectrum of interpretations rang-

8. Memorandum in Support of S. 8962, N.Y. Legislature, 195th Sess. (February 29, 1972) (unpublished).

9. Anderson v. Pacific Coast S.S. Co., 225 U. S. 187, 200, 32 S.Ct. 626, 56 L.Ed. 1047 (1912). See the discussion accompanying note 13 *infra.*

ing from plaintiff's contention that it applies to *any* crossing of the bar area to defendant's position that it refers solely to vessels sailing out "over" the bar.

When the phrase is taken in its entirety, i. e., "bound in or over the bar of Sandy Hook," the ambiguity of the latter phrase can be resolved by reconciling it with the initial phrase, "bound in." Since the first part clearly refers to vessels entering the New York harbor by crossing over the Sandy Hook bar area, plaintiff's contention that the latter phrase refers to *any* crossing of that area would render that phrase repetitious insofar as it would refer to entering vessels. But the construction of this section on the basis that associated words explain and limit each other (*noscitur a sociis*) and on the further basis that specific words limit and restrain general terms would appear to suggest a contrary conclusion. If the general term "bound . . . over" is interpreted as incorporating all of the possibilities not included in the specific words "bound in," then the latter would be rendered nugatory in effect since it would in fact impose no limitation on the former, which, on the broadest possible interpretation could include vessels crossing the bar area for *any* purpose, including vessels bound *into* as well as those bound out of the harbor. Therefore, in order to attribute meaningful effect to the specific words, they must be regarded as imposing *some* limitation on the general terms. It would hardly make sense to apply that limitation to outward bound vessels because that would lead to the duplicative construction of the phrase as a reference to any crossing of the bar area, including inward bound vessels. Thus we must conclude that the limitation is imposed on the very broad interpretation of "bound . . . over" as *any* crossing and consequently the only remaining construction is that the term "bound . . . over" is limited to outward bound vessels.

This construction gains substantial corroboration from the terms employed in other sections of the pilotage statute.

Since the particular section in issue here is a compulsory pilotage provision which imposes a pilotage fee regardless of whether a pilot is actually employed or not, it is especially pertinent to look to those sections which set out the fee structure. The two main provisions in this regard are N.J.S.A. § 12:8–24 (1968), entitled "Pilotage rates on inward-bound vessels" and § 12:8–27, entitled "Pilotage rates on outward-bound vessels." Both begin with the same proviso: "The fees for pilotage for vessels, inward [outward] bound, and not exempted from pilotage by any law of this state or any regulation thereunder, shall be. . . ." Similarly, § 12:8–28 provides for additional fees between November and April to be "added to the full pilotage of every vessel coming into or going out of the ports of [New Jersey] or New York." The use of the terms "inward" and "outward" and "coming in" or "going out" leave no doubt as to the movements contemplated by these sections. Notably, § 12:8–29 entitled "Fees for moving vessels in [the] harbor of New York," is, by its explicit terms, clearly inapplicable to the movement in question here.

Thus, plaintiff is claiming fees pursuant to § 12:8–30, entitled "Rates for intermediate distances." That section provides:

"The rates of pilotage for any intermediate distances shall be determined by the commissioners and promulgated in their rules and regulations for the government of pilots."

Since § 12:8–33 keys New Jersey's rates to New York's, the operative schedule is established by N.Y. Pilotage Regulation 55.1(b) quoted in footnote 6 *supra*. Because § 12:8–30 gives no intimation of the kinds of movements it is intended to cover, it is of no assistance in determining whether or not it may, under given circumstances, be applicable to the com-

pulsory pilotage provision of § 12:8–35. It is therefore the scope of the latter which will determine this question, rather than *vice versa*. However, in this regard defendant argues quite persuasively that N.Y. Pilotage Regulation 55.1(b) explicitly keys its rates to compulsory pilotage rates, and therefore, by negative inference, *distinguishes* the kinds of movements that it covers from those subject to compulsory pilotage, i. e., in New York, "vessels entering or departing from the Port of New York by the way of Sandy Hook."[10] Because § 12:8–33 does incorporate this New York regulation this argument pertains equally to the New Jersey statutory scheme as well.

It is also noteworthy that liability for the pilotage fees is imposed on the "master, owner, agent or consignee entering or clearing the vessel." § 12:8–38.

Other sections of the statute also lend support to the conclusion that compulsory pilotage applies only to vessels entering or leaving the port. Section 12:8–16 contains the "oath of pilots" which includes the phrases "I will at all times use by [*sic*] best endeavors to repair on board all ships and vessels that I shall see and conceive to be bound for, or coming into, or going out of the harbor [of Jersey City, Newark, Perth Amboy and Sandy Hook] . . . I will . . . make the best dispatch in my power to bring safely over the bar at Sandy Hook every vessel committed to my care in coming in or going out. . . ."

Both sections pertaining to duties of pilots make explicit references to the path of the voyage. Section 12:8–22 provides that "[e]very pilot . . . upon taking charge of a vessel either outward or inward bound, shall cause the lead to be regularly hove. . . ." Similarly, § 12:8–23 pro-

vides that "New Jersey and Sandy Hook pilots may arrange with the New York pilots to regulate the stationing of pilot boats to receive pilots from outward-bound vessels."

Section 12:8–36 exempts New Jersey masters of coasting vessels from compulsory pilotage "whose vessel is bound either in or out of any of the waters of this state or over which it has concurrent jurisdiction with other states . . . whether the same be . . . in or over the bar of Sandy Hook. . . ."

Finally, § 12:8–47, the penal section with respect to piloting without a license, makes it a misdemeanor for an unlicensed person to "pilot or offer to pilot a vessel, not exempted by the laws of this state from pilotage, to or from the ports of [New Jersey], by way of Sandy Hook. . . ."

Taken together, these various sections of the statute manifest a discernible pattern of references to vessels entering or departing the New York harbor by crossing the Sandy Hook bar area. Thus, in order to ascribe a consistent, harmonious and effective construction to the compulsory pilotage provision (§ 12:8–35) the phrase "bound . . . over the bar" must be regarded as an allusion to outward bound vessels. This construction not only reconciles this section with the others of the statute, but also avoids the direct inconsistencies that would result from a broader interpretation, e. g., *vis-a-vis* the liability provision, § 12:8–38, and moreover, it avoids what would be an extremely unfortunate, as well as untenable conflict with the *in pari materia* New York statute.[11]

### The Federal Scheme as Applied to New Jersey

Section 12:8–35 was first enacted in 1869 and, apparently, reenacted in 1877. L. 1869, ch. 399, § 2 N.J.Stat. 1049

---

10. The regulation also alternatively provides for a $75 minimum, but plaintiff's claims exceed this in each of the three instances.

11. In addition to the constitutional issues that might be raised, *see* 46 U.S.C. § 213 (1970) prohibiting discriminatory pilotage rates.

(1869), suppl. to N.J.Rev.Stat. 819 (1877). Neither counsel nor the Court have been able to unearth any scintilla of legislative background of this statute. We do, however, have some indication of one contemporaneous event which bears directly on the New Jersey statute.[12] The savings clause in 46 U.S.C. § 215 (1970) was originally passed in 1867[13] and Mr. Justice Hughes sheds some light on the purview of that enactment in Anderson v. Pacific Coast S. S. Co., *supra*, 225 U.S. at 200:

" . . . The reason for the distinction may be found in the fact that the registered vessels, under the conditions of trade then existing, would presumably be engaged in the longer voyages, touching at foreign ports where Federal pilots would not avail, and at domestic ports, for all of which the ship's pilot might not hold a Federal license; and, as Congress did not create local Federal establishments for port pilotage, it was evidently deemed unwise to compel registered vessels in *entering and leaving* ports to be under the control of Federal pilots." (Emphasis added)

Since the New Jersey statute was reenacted in 1877, and clearly was designed to cover only those vessels not preempted by the Federal legislation, the legislature must be deemed to have been cognizant of this rationale. Thus, as in the case of the New York statute, the underlying logistic difficulties that served as the basis for leaving the regulation of "port pilotage" of certain kinds of vessels to the states hardly seem to be applicable to the kinds of intra-harbor shifts involved in this case.

Moreover, Justice Hughes' review of the statutory history of the federal provision reveals a consistent pattern of references to vessels "entering or leaving" a port when referring to state regulation. This, of course, ties in closely with the concept of vessels engaged in lengthy, presumably international, voyages touching at numerous ports. That pattern adds substantial support to a construction of the federal statute which would give operative effect[14] to those terms in the current statute. Thus the reconciliation of the New Jersey statute with the federal statutory scheme seems to foreclose the plaintiff's broad interpretation and militates in favor of a construction of the phrase "bound . . . over" as meaning "bound [out] over" the bar area.[15]

### Conclusion

Since both the New York and New Jersey compulsory pilotage provisions apply exclusively to vessels entering or departing the New York harbor by way of Sandy Hook, plaintiff is not entitled to compulsory pilotage fees with respect to the harbor movements here in question. Judgment is entered for the defendant. Each party is to bear its own costs.

It is so ordered.

---

12. As to the relevancy of such matters, *see* 1 Blackstone, Commentaries * 61.

13. Act of February 25, 1867, ch. 83, 14 Stat. 411 (1868), re-enacted, Act of February 28, 1871, ch. 100, § 51, 16 Stat. 455 (1871), codified in R.S. § 4444.

14. Montclair v. Ramsdell, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1882); United States v. Menasche, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955); Queensboro Farms Products, Inc. v. Wickard, 137 F.2d 969, 976 (2d Cir. 1943).

15. This conclusion as to the New Jersey statute, and the similar conclusion as to the New York statute, may give rise to the unfortunate circumstance of creating a hiatus in the overall regulation of compulsory port pilotage in the New York harbor for it appears that as a result of this decision the kinds of vessels in question here making the moves that were made here may not be subject to either federal or state regulation. We have been mindful of the prospect of this eventuality throughout our deliberations. Nevertheless, we feel that the conclusion reached here is correct and the question of the desirable scope of the network of interrelated compulsory pilotage statutes is properly one for Congress and the state legislatures. *Cf.* Anderson v. Pacific Coast S.S. Co., 225 U.S. 187, 205, 32 S.Ct. 626, 56 L.Ed. 1047 (1912).