## THE MASCOTTE.

### SHAW v. THE MASCOTTE.

*(District Court, S. D. Florida.   June 26, 1889.)*

**1. PILOTAGE—HALF PILOTAGE—SPEAKING VESSEL.**
It is the duty of a pilot, in speaking a vessel for pilotage, to use such signals as are ordinarily in use to denote the presence of a pilot and the offer of services, in order to inform the master of his character, and give him an opportunity to accept or reject them. Such signals should be made seasonably, so that the officers of the vessel may see them. In the absence of such signals, the burden is upon the pilot to show that his hail and offer were heard and understood.

**2. SAME.**
Where the pilot left his pilot-boat anchored two and a half miles from the channel, and came with a small boat, showing no light, until within from one to three hundred feet of the steamer, and no flash-light until the steamer had passed and left him abaft the beam, so that such flash was not seen by any of the officers of the steamer, nor the pilot's hail heard by those on the steamer, *held*, there was no such speaking as would entitle him to pilotage.

*(Syllabus by the Court.)*

In Admiralty. Libel for half pilotage for not accepting services of a pilot.

*L. W. Bethel*, for libelant.

*G. Bowne Patterson*, for respondent.

LOCKE, J.   This is the third suit for half pilotage against this vessel, the Mascotte, wherein the same principles and questions are involved. In the first two cases no opinions were filed, but the conclusions of law and fact briefly stated from the bench, and are merely referred to here to show the opinions upon the different state of facts found in the three cases.   The act of Florida of February 27, 1872, provides that all steamers or vessels entering or leaving any port of this state shall pay to the pilot who shall first speak said steamer or vessel the regularly established rates of pilotage, but that all vessels carrying the regular United States mails shall pay half pilotage only.   The Mascotte carried the regular mail, and would therefore pay no more when employing a pilot than when spoken and not accepting his services.   The question in these several cases is what constitutes "a speaking" of a vessel, within the contemplation of the law, and was this vessel spoken on the several occasions?

The relations existing between the masters of vessels and pilots under the so-called "Compulsory Pilotage Laws" are peculiar.   It has been frequently held that although not, strictly speaking, a penalty for not employing a pilot, it is a gratuity, with no direct benefit rendered or service demanded, and therefore requires a strict construction as against the pilot.   The pilot's and master's duty are reciprocal,—the pilot to be there and offer his services, and the vessel to pay whether his services are accepted or not.   But, in order to justly demand of the master of a vessel a compensation for being on hand and offering his services, the pilot should offer them in a way which would not only be an offer on his part, but which must be so made as to be understood as such by the master. The simple term "speaking," without further construction or explanation, cannot be accepted as expressing the will, intention, or design of the legislature.   The pilot might speak a vessel, and ask any number of questions.   What port she is from? what was her cargo? or, how long they had been on the voyage? any of which would be a speaking, but no one would for a moment consider that this was such a speaking as is contemplated or required.   The statutes of different states use different language in providing for the speaking of a vessel by a pilot.   In New York, the term "offering his services" or "tendering his services" is used.   In Pennsylvania, he "shall offer himself."   The vessels going up the Delaware river must pay half pilotage for "refusing or neglecting" to take a pilot.   In North Carolina the vessel "pays pilotage for refusing to take a pilot;" and in Louisiana, for "refusing to take a pilot when one offers."   But there can be no question but what the legislatures of all states had one idea in common, and meant a plain and distinct offer by the pilot of his services, so made that the master of the vessel could have it within his power to employ or refuse him.   Anything less than that would lead to an injustice and hardship that no court could sustain without the most positive enactment. ·

I have been referred to one case in which the construction of the term "speaking" has been attempted, but which has left the question in but little better condition, if any, than before.   *The Ullock,* 19 Fed. Rep. 207.

In that case the pilot commissioners declared that the speaking of a vessel or the offer of a pilot's services on the bar should be construed to mean either the usual form of hailing, or the usual code of signals, without declaring what the usual code of signals was understood to be; but the commissioner, in testifying, stated that he understood the offer to be customarily made in the day-time by "putting her head down towards the ship, and showing a blue flag," and "at night by burning a flare." That case was determined upon the fact that the pilot-boat was beyond the distance which had been determined by the commissioners, so that the question as to the usual code of signals was not involved; and what the learned judge would have held necessary under other circumstances is uncertain. But it is stated in the opinion that the usual signals by which an offer of pilot service is made in the day-time is a flag at the mast-head, in this country the modification of the country's flag known as the "jack," and that "the burning of flare-ups or a flashing light, over the side of the boat at short intervals, is also the customary method of making an offer of pilot services at night," but whether an offer, where these customary methods are disregarded, would be considered sufficient, is uncertain. These ordinary customs and rules or regulations, whether established by use for an indefinite period of time or direct legislation, show plainly that one thing has been aimed at,—the distinguishing of pilot-boats as a class from any other class of vessels. In most ports of importance they are licensed, numbered, and their numbers painted on their sails. They have their distinguishing flag, the jack, by day, and their distinguishing light, the flash, unlike any other class of vessels, by night. These are the ordinary distinguishing marks for which every master looks when desiring one.

The "speaking" it could never have been intended should be left to the uncertainties of the human voice. Nor could every master be presumed to stop and pay attention to the hail of every small boat in entering a port, to ascertain if it is a pilot offering his services, unless there is some distinguishing signal. It is true, as was remarked by the learned judge in *The Alcalde*, 30 Fed. Rep. 133, that "it mattered not to the master to whom the pilot offered his services on the pilot-ground how he got there. He may have trusted to a canoe, or even swam out. If he is on the ground, and ready and capable of taking charge of the vessel, that is all the master can require." But the master is entitled to the full knowledge and information that it was a pilot speaking for pilotage, and where the question is whether there had been a sufficient speaking and offer of services, when the testimony shows the hail was not heard on board, I am satisfied that the visible surroundings of the pilot should have much weight in determining it. And one speaking from a regular pilot-boat, with a jack flying by day at a mast-head, and flash-light at night, would be recognized, when the canoeist or swimmer would be disregarded.

Where the pilot uses all the usually accepted and ordinary means of conveying information of his character, the burden of proof is on the master who claims that the speaking, hailing, or offering was not sufficient to give him the necessary knowledge; but where all the ordinary

and generally accepted means are neglected, or, as it appears in this case, an attempt made to conceal the character of the pilot, until speaking alone might betray it, the burden is upon the pilot to show satisfactorily that the master understood him, and had an opportunity to accept or reject his services.

In the first case mentioned (*Acosta* v. *The Mascotte*) it appears that the pilot-boat was anchored in or near the channel, at night, without any light, but that the pilot went off on a small boat, and, as the steamer came by, hailed it. The master said that he saw a vessel anchored there without any light, and so reported to the officers of the customs, upon arriving in port, but that he had no knowledge that it was a pilot-boat; that he saw a small boat, but heard no hail, nor did the officer on the bridge, the lookout, or the quartermaster know of the steamer's having been spoken by a pilot. The small boat had a plain white light, which it showed a short time before the steamer passed.

In the second case, (*Shaw* v. *The Mascotte*,) the pilot-boat lay in back of Sand Key, with an anchor light up, but showing no other light, and when the Mascotte was seen coming the pilot went off in a small boat, some over a mile, to speak her. This small boat was seen in the channel, and, just as the steamer approached, showed a lantern. The pilot says he put his hat over it occasionally to make it a flash-light, and hailed the steamer as she passed; but all of the witnesses, officers and men, on the deck of the steamer, testify that they heard no hail, nor anything that could be understood, and that they had no knowledge that it was a pilot. In these cases, I considered that there had been a willful concealment of the character of the pilot-boat, and that the evidence was not enough to show the bringing home to the master the knowledge of the offer of his services sufficiently to compel the payment of the compulsory pilotage, and therefore dismissed the libels.

In this case a new question of fact arises. The pilot-boat was anchored back of the Eastern dry-rocks, two and a half miles from the channel where the steamer was expected, and a dingy-boat, with a pilot and two men, sent out from Sand Key light, a light-house station about half way between where the pilot-boat was lying and the channel where the steamer was expected. The pilot says he had a bright white light,—a lantern,—which he showed all the time, and a flash-light, which he showed just as he came to the steamer. He says the white light was a lantern which he held in his hand so it could be seen all around; that the flash was a regular flash-light; that he displayed it once, dipping it down two or three seconds, so as to make it show plainer; that the steamer was passing when he last displayed it. He says he was about 100 feet off the steamer's port bow when he first showed the flash-light. Weltus, one of the pilot's crew, with him in the boat, says they went off in the boat, and stopped until the steamer came up abreast of them. Then they spoke her. The captain held the lantern up in his hand. The flash-light was used once,—dipped once and shown twice. He says they were 100 or more feet away when they displayed these lights. Williams, another of the crew, testifies to the

same. The master of the Mascotte says, as they were coming to the westward of Sand Key, he saw nothing but the three light-houses until he saw a dark object in the water; that he thought it might be the Western dry-rocks; that he took his glasses and saw it was a row-boat; that he saw a man take a light from the bottom of the boat and hold it up, but he heard nothing; that there was no light shown until the boat was abeam of the ship; that when he first saw the boat it was two points forward of the beam, but there was no light there; that he was on the bridge, and could have heard anything said, but heard nothing; that there was no pilot-boat in sight or light seen on any vessel; that all the light he saw was the one the man took up from the bottom of the boat, and held up; this was not until the boat was abeam of the ship; that there was no flash shown, that he saw. The second officer of the Mascotte says that he was on the bridge with the captain; that the captain saw the boat first; that it was just a little ahead on the port bow; just as they got up very nearly abreast of the boat, a little forward of the beam, he saw a white light; saw no light before; this was the only light he saw; that he was looking at it continuously, and, had there been a flash-light, he would have seen it; that after it went abaft the beam he did not turn to look at it; that he looked at it all the time until it got abeam; that he did not know that there was a pilot there. The watchman on the port bow says he saw something black, about 100 or 150 yards on the port bow; when it got abreast of the beam he saw a bright white light; there was no other light; no flash-light; that he looked at it continuously until it was abaft the beam; then he did not see it any more; that he did not hear any hail from the boat. The light-keeper at Sand Key says he saw the boat when near the Mascotte; that he saw the light; a white light first; then a flash-light; then the Mascotte hid the lights, and, as she passed, he saw the lights again; that he was about one and a quarter or one and a half miles distant; that he first saw the lantern light, then the flash, before the Mascotte and boat came together; that he saw the flash-light again; he cannot say whether once or twice after the Mascotte passed.

In this condition of the testimony, what can be accepted as the true state of facts? When was the flash-light shown? for, viewed from the standpoint of the respondent, this may be considered an important question in the case. According to the testimony of the pilot and crew, it was off the bow, or where it must have been seen by the officers of the steamer; but they swear positively that there was no flash shown—nothing but a white lantern light—until the boat had passed abaft the beam. Their business was forward, and not aft, and they naturally paid no attention to what they had passed, and therefore saw no flash. The testimony is directly contradictory in this respect, and where has been the mistake, if any? I thought at first that the testimony of the light-keeper at Sand Key would determine the question, but, upon considering the course the vessel was steering, and the direction the light-house bore from her, it appears that a light could be seen from the light-house in a range forward of the bow of the steamer when abaft her beam, if

the light was as far from the steamer as those on the steamer testify; or that the steamer would not necessarily shut out the light, until it had passed quite a little distance ahead of it.  So this testimony can have no conclusive weight, and the question of the probabilities of error must be considered.  The testimony of the officers of the steamer that there was no flash shown while the boat was in their sight is so direct and positive, and they so entirely disinterested, as far as any profit or advantage could come to them, and otherwise apparently entitled to the utmost confidence, that it should require fully as positive and direct testimony on the opposite side to overcome the strong presumption of the truth of their statements.  The pilot says that he spoke the steamer, and received no answer; that they heard people talking on deck; that he showed the lantern and the flash-light when they were off the port bow.  Weltus says that they waited until the steamer came up abreast of them, when they spoke her, and the captain held the lantern up in his hand, and showed the flash.  Williams says that they were about 100 feet from the Mascotte when they showed the lantern and the flash-light. The pilot also stated, before any question of the time when the lights were shown had arisen, that when the flash was being shown the second time the steamer was passing them.  If there could be any question of judgment as to the position of the boat to the steamer, those on board the steamer could judge more accurately than those in the boat.  I can come to but one conclusion,— that the pilot permitted the steamer to approach as near as he considered safe in order to speak her; then displayed the lantern, and as soon as he could displayed the flash-light; but that from some accident, loss of matches, or other cause there was a delay in lighting the torch until the steamer, going very rapidly, had passed and left them abaft the beam. I have no doubt but what they commenced to make a display of the torch when perhaps off the bow, but I am satisfied it was not finally displayed until too late to be seen by the master or officers.  I cannot give a shadow of truth to the entire testimony by any other supposition, and am not able to bring my mind to disbelieve the testimony of those on the steamer that there was no flash-light within their sight.

What is the legal effect of this condition of facts? I am satisfied the flash-light was not displayed until the boat was so far abaft the beam of the steamer that the master did not see it.  Nor was it flashed so that with due diligence he could have seen it.  The rule for the lights of a pilot-boat (article 11, § 4233, Rev. St.) is a flash-light every 15 minutes.  The usual signal as recognized in *The Ullock*, and with which I heartily concur, is a flash at frequent intervals.  The pilot says he saw the steamer coming some 15 miles off; but, making all allowance, she must have been in sight from half to three-quarters of an hour at the least, and no light was shown, according to his own statement, until he was within about 100 feet, or, the statement of those on the steamer, 100 yards; and I am satisfied no flash—the light to distinguish the boat as containing a pilot—was shown until she was too far abaft the beam to be seen by those in charge of the steamer.  The flash was to denote the character of the boat, and should have been shown from the small boat, if that

had been taken for the service, as well as from the large one, and in season to show his presence. I do not consider the claim for pilotage against any vessel entering one of the larger ports of our country, made under the same circumstances, speaking from a small dingy-boat, with no distinguishing marks or signals, would be entitled to any consideration, and the argument that the master should have presumed it was a pilot because it was not probable that any other small boat would be out there at that time of the night cannot be accepted. I do not consider the libelant used the ordinary customary signals in time to make his presence and character known to the respondent; and the testimony is positive that the hail was not heard on board, and there was therefore no legal and sufficient speaking to justify judgment. The libel is therefore dismissed.