W. E. JACKSON et al., d/b/a Port Everglades Pilots Association, Plaintiffs-Appellees,

Robert L. Shevin, as Attorney General of the State of Florida, and Florida State Pilots Assoc., Inc., Intervenors-Appellees,

v.

MARINE EXPLORATION COMPANY, INCORPORATED and Greyhound Leasing & Financial Corporation, Defendants-Appellants.

No. 76–2876.

United States Court of Appeals, Fifth Circuit.

Nov. 16, 1978.

dowski the trial court's actions on remand will be limited by the pretrial agreement.

Reginald M. Hayden, Jr., Miami, Fla., for defendants-appellants.

Louis de la Parte, Tampa, Fla., Underwood, Gillis, Karcher, Reinert & Gordon, David P. Karcher, Miami, Fla., for plaintiffs-appellees.

Before BROWN, Chief Judge, THORNBERRY and CLARK, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This case involves a challenge to the Florida version of one of the country's oldest monopolistic regulatory systems—the institution of state compulsory pilotage. For years, Marine Exploration Company, Inc. (MECI) has operated tugs and barges under registry in and out of Port Laudania, Florida, without using or paying for the services tendered by the state-licensed local pilots as required by Florida law. The various local pilots, who had joined together as the Port Everglades Pilots Association (PILOTS), brought suit in the Southern District of Florida to recover the pilotage fees and charges to which they were entitled under Florida law.[1] MECI interposed a number of constitutional and statutory defenses.[2] None were found availing by the District Court, which, after a bench trial, entered judgment for PILOTS in the amount of $27,807.69, covering the pilotage fees the defendants had incurred through September 30, 1975. We affirm this judgment, as both history and the law stand in firm opposition to MECI's attempt to escape from one of the incidents of its maritime business.

To attempt an evaluation of the smokescreen of legal arguments raised here before us on appeal without first fixing our compass upon the system of compulsory pilotage would only invite confusion. Accordingly, we defer further discussion of the facts and our analysis of MECI's claims until after a brief review of the institution of pilotage and those aspects of the concurrent federal-state system for regulating pilotage that are relevant to this case.

### Pilotage And Its Regulation In The United States

As a profession, pilotage owes its existence to the infinite variety of navigation

1. PILOTS identified their claim as an admiralty and maritime claim under F.R.Civ.P. 9(h) and, as such, the District Court had jurisdiction under 28 U.S.C.A. § 1333(1).

2. PILOTS also sued Greyhound Leasing & Financial Corp., which owns three of the vessels MECI operated and PILOTS charged pilotage fees. Although Greyhound remained a defendant throughout the proceedings before the District Court and is also an appellant in the case on appeal, for the sake of simplicity we will refer only to MECI, which assumed control of the litigation and undoubtedly is primarily responsible for the judgment entered below.

hazards—currents, tides, sand bars, submerged objects, weather conditions, and the like—that mark the harbors and rivers open to commercial vessels. No matter how competent the master of a ship is at open sea, he cannot be expected to be familiar with the local navigation hazards of each harbor and river that he encounters as he conducts his ship in the course of a maritime trade. See *The Framlington Court*, 5 Cir., 1934, 69 F.2d 300, 304, 1934 A.M.C. 272. Accordingly, it has long been the practice of vessels to employ, for each port they enter and leave, a local pilot intimately familiar with the waters of that port to board and guide them through those waters in from or back to the open sea.

As the Supreme Court has remarked, "[p]ilots are * * * indispensable cogs in the transportation system of every maritime economy. Their work prevents traffic congestion and accidents which would impair navigation in and to the ports. It affects the safety of lives and cargo, the cost and time expended in port calls, and in some measure, the competitive attractive-

ness of particular ports." *Kotch v. Board of River Port Pilot Commissioners*, 1947, 330 U.S. 552, 558, 67 S.Ct. 910, 913, 91 L.Ed. 1093.

Indeed, local pilotage has been regarded so important to the conduct of maritime affairs that for centuries commercial states with substantial shipping trades have required vessels entering or departing their ports to take on board a local pilot or to pay some sort of penalty.[3] In this country, compulsory pilotage laws date back to the time of the Revolution[4] and today, at least 23 states have such laws as part of a comprehensive pilotage regulatory system.[5]

Those states with pilotage laws typically establish some sort of licensing system for local harbor and river pilots. While vessels subject to the pilotage laws usually are not compelled to employ a state-licensed local pilot, they are required to pay some form of pilotage fees to the first state-licensed pilot who tenders his services to them whether they avail themselves of those services or not.[6] The actual pilotage fees are either

---

3. The obligation on the captain to take a pilot, or be responsible for the damages that might ensue, was prescribed in the Roman Law. The Hanseatic ordinances, about 1457, required the captain to take a pilot under the penalty of a mark of gold. The maritime law of Sweden, about 1500, imposed a penalty for refusing a pilot of 150 thalers, one-third to go to the informer, one third to the pilot who offered, and the residue to poor mariners. By the maritime code of the *Pays Bas* the captain was required to take a pilot under a penalty of 50 reals, and to be responsible for any loss to the vessel. By the maritime law of France, ordinance of Louis the XIV, 1681, corporal punishment was imposed for refusing to take a pilot, and the vessel was to pay 50 livres, to be applied to the use of the marine hospital and to repair damages from stranding. In England (3 George I, ch. 13), if a vessel were piloted by any but a licensed pilot, a penalty of £ 20 was to be collected for the use of superannuated pilots, or the widows of pilots.

   *Ex parte McNiel*, 1871, 80 U.S. (13 Wall.) 236, 239, 20 L.Ed. 624. *See also* U.S. Dep't of Commerce, Pilotage in the United States (Special Agents Series No. 136, 1917).

4. See, *e. g.*, Mass.Laws, c. 13 (1783).

5. Regulations on pilotage are in force in the following states: Alabama, California, Con-

necticut, Delaware, Florida, Georgia, Indiana, Louisiana, Maine, Maryland, Massachusetts, Mississippi, North Carolina, New Hampshire, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, Virginia, and Washington.

6. The Supreme Court has on several occasions articulated the rationale underlying this requirement that vessels subject to state pilotage laws pay pilotage fees whether or not they actually engage a state-licensed pilot. For example, in *Steamship Company v. Joliffe*, 1864, 69 U.S. (2 Wall.) 450, 17 L.Ed. 805, the Court observed that

   The object of the regulations established by the statute, was to create a body of hardy and skilful seamen, thoroughly acquainted with the harbor, to pilot vessels seeking to enter or depart from the port, and thus give security to life and property exposed to the dangers of a difficult navigation. This object would be in a great degree defeated if the selection of a pilot were left to the option of the master of the vessel, or the exertions of a pilot to reach the vessel in order to tender his services were without any remuneration. The experience of all commercial states has shown the necessity, in order to create and maintain an efficient class of pilots, of providing compensation, not only when the services tendered are accepted by the master of the vessel, but also when they are declined.

specified by the state statute or fixed by an administrative agency.

The power of the states to engage in such regulation of pilotage was at center stage in the Supreme Court's decision in *Cooley v. Board of Wardens,* 1851, 53 U.S. (12 How.) 299, 13 L.Ed. 996, which remains the landmark case construing the interrelationship of state and federal regulatory power under the Commerce Clause. In *Cooley* a penalty equal to half the pilotage had been imposed pursuant to state statute upon a shipmaster who had failed to engage a local pilot while entering the port of Philadelphia. The shipmaster challenged the Pennsylvania compulsory pilotage law as an unconstitutional state regulation of interstate commerce. The Supreme Court acknowledged that state laws concerning pilotage are regulations of commerce within the scope of Congress's Commerce Clause power, but held that pilotage was among those peculiarly local concerns that could constitutionally be regulated by the states in the absence of any conflicting federal legislation, *id.* at 319. In reaching this determination, which it has subsequently reaffirmed on

numerous occasions,[7] the Court relied heavily on the Act of Aug. 7, 1789, c. 9, § 4, in which Congress provided that state pilotage regulations would remain in effect until "further legislative provisions shall be made by Congress."[8]

In 1837 Congress began to enact "further legislative provisions" and to shape a system of concurrent federal-state regulation of pilotage. By 1871, the broad outline of this system as relevant to this case had been completed.[9] Central to this concurrent system of pilotage regulation is the distinction between enrolled vessels and registered vessels, a classification scheme that has existed since the early days of the Republic.

*Ships engaged in trade with foreign lands are "registered," a documentation procedure set up \* \* \* in the Act of Dec. 31, 1792, 1 Stat. 287, and now codified in 46 U.S.C. c. 2. \* \* \* Vessels engaged in domestic or coastwise trade or used for fishing are "enrolled" under procedures established by the Enrollment and Licensing Act of Feb. 18, 1793, 1 Stat. 305, codified in 46 U.S.C. c. 12.*

69 U.S. (2 Wall.) at 456. In a similar vein, the Court remarked in *Cooley v. Board of Wardens,* 1851, 53 U.S. (12 How.) 299, 13 L.Ed. 996, that such laws

rest upon the propriety of securing lives and property exposed to the perils of a dangerous navigation, by taking on board a person peculiarly skilled to encounter or avoid them; upon the policy of discouraging the commanders of vessels from refusing to receive such persons on board at the proper times and places; and upon the expediency, and even intrinsic justice, of not suffering those who have incurred labor, and expense, and danger, to place themselves in a position to render important service generally necessary, to go unrewarded, because the master of a particular vessel either rashly refuses their proffered assistance, or, contrary to the general experience, does not need it.

53 U.S. (12 How.) at 312.

7. *E. g., Steamship Co. v. Joliffe,* 1864, 69 U.S. (2 Wall.) 450, 459–63, 17 L.Ed. 805; *Ex parte McNiel,* 1871, 80 U.S. (13 Wall.) 236, 240–42, 20 L.Ed. 624; *Wilson v. McNamee,* 1880, 102 U.S. (12 Otto) 572, 26 L.Ed. 234; *Olsen v. Smith,* 1904, 195 U.S. 332, 341, 25 S.Ct. 52, 49 L.Ed. 224; *Thompson v. Darden,* 1905, 198 U.S. 310, 315, 25 S.Ct. 660, 49 L.Ed. 1064; *Anderson v. Pacific Coast S.S. Co.,* 1912, 225 U.S. 187, 195, 32 S.Ct. 626, 56 L.Ed. 1047; *Ray v. Atlan-*

*tic Richfield Co.,* 1978, 435 U.S. 151, 179–80, 98 S.Ct. 988, 55 L.Ed.2d 179.

8. The full text of the Act of Aug. 7, 1789, c. 9, § 4, 1 Stat. 53, 54, is as follows:

That all pilots in the bays, inlets, rivers, harbors and ports of the United States, shall continue to be regulated in conformity with the existing laws of the States respectively wherein such pilots may be, or with such laws as the States may respectively hereafter enact for the purpose, until further legislative provision shall be made by Congress.

The basic congressional affirmation of the States' authority to regulate pilotage, in the absence of congressional legislation to the contrary, is today embodied in 46 U.S.C.A. § 211:

Until further provision is made by Congress, all pilots in the bays, inlets, rivers, harbors, and ports of the United States shall continue to be regulated in conformity with the existing laws of the States respectively wherein such pilots may be, or with such laws as the States may respectively enact for the purpose.

9. For an account of the statutory development of this system between 1837 and 1871, see *Anderson v. Pacific Coast S.S. Co.,* 1912, 225 U.S. 187, 195–98, 32 S.Ct. 626, 56 L.Ed. 1047.

*Douglas v. Seacoast Prods., Inc.,* 1977, 431 U.S. 265, 272–73, 97 S.Ct. 1740, 1745, 52 L.Ed.2d 304, 1977 A.M.C. 566 [Emphasis added].[10]

The federal government has assumed exclusive authority over the regulation of pilots on *enrolled* vessels. 46 U.S.C.A. § 364 provides that all coastwise seagoing vessels *not sailing under register* shall be "under the control and direction of pilots licensed by the Coast Guard."[11] In addition, by virtue of 46 U.S.C.A. § 215, the states are specifically precluded either from requiring the pilots of such coastwise seagoing vessels to obtain a license in addition to the Coast Guard license or from imposing pilotage fees upon such vessels.[12]

But § 215 also underscores the fact that federal preemption of pilotage does not extend to *registered* vessels. The last sentence of that section stipulates that nothing in the federal pilotage law "shall be construed to annul or affect any regulation established by the laws of any State, requiring vessels entering or leaving a port in any such State, *other than coastwise steam vessels,* to take a pilot duly licensed or authorized by the laws of such States * * *." [Emphasis added].

The combined effect of sections 364 and 215 was summarized succinctly by the Supreme Court only Last Term. "[J]ust as it is clear that States may not regulate the pilots of enrolled vessels, it is equally clear that they are free to impose pilotage requirements on registered vessels entering and leaving their ports." *Ray v. Atlantic Richfield Co.,* 1978, 435 U.S. 151, 159–60, 98 S.Ct. 988, 995, 55 L.Ed.2d 179, —— A.M.C. ——; *see also Anderson v. Pacific Coast S.S. Co., supra,* 225 U.S. at 201, 32 S.Ct. 626.

### Pilotage Regulation In Florida

The history of pilotage regulation in Florida, although not as long as in most Eastern coastal states, is still a venerable one. Flor-

---

**10.** Vessels under enrollment or license may not engage in foreign trade; if they do so, they along with their cargo are subject to forfeiture. See 46 U.S.C.A. § 278. The quid pro quo is that only vessels under enrollment or license may engage in coastwise trade or the fisheries, or navigate the Great Lakes. See 46 U.S.C.A. §§ 251, 263.

**11.** The full text of 46 U.S.C.A. § 364 is as follows:

All coastwise seagoing vessels, and vessels navigating the Great Lakes, shall be subject to the navigation laws of the United States, when navigating within the jurisdiction thereof; and all vessels, propelled in whole or in part by steam, and navigating as aforesaid, shall be subject to all the rules and regulations established in pursuance of law for the government of steam vessels in passing, as provided by title 52 of the Revised Statutes; and every coastwise seagoing steam vessel subject to the navigation laws of the United States, and to the rules and regulations aforesaid, not sailing under register, shall, when under way, except on the high seas, be under the control and direction of pilots licensed by the Coast Guard.

**12.** 46 U.S.C.A. § 215 provides that

No State or municipal government shall impose upon pilots of steam vessels any obligation to procure a State or other license in addition to that issued by the United States, or any other regulation which will impede such pilots in the performance of the duties required by title 52 of the Revised Statutes; nor shall any pilot charges be levied by any such authority upon any steamer piloted as provided by title 52 of the Revised Statutes; and in no case shall the fees charged for the pilotage of any steam vessel exceed the customary or legally established rates in the State where the same is performed. Nothing in title 52 of the Revised Statutes shall be construed to annul or affect any regulation established by the laws of any State, requiring vessels entering or leaving a port in any such State, other than coastwise steam vessels, to take a pilot duly licensed or authorized by the laws of such State, or of a State situate upon the waters of such State.

There is some ambiguity as to precisely what the term "steam vessels" comprehends for purposes of 46 U.S.C.A. §§ 215 and 364. The only statutory definition of "steam vessels" is that provided in 46 U.S.C.A. § 361: "Every vessel subject to inspection propelled in whole or in part by steam or by any other form of mechanical or electrical power shall be considered a steam vessel within the meaning of and subject to all the provisions of this Act." Strong arguments can be mounted that § 361 defines "steam vessels" for all of Title 46, but the Attorney General has issued an opinion concluding that while clarifying legislation is desirable, § 361 should be construed to apply only to the Act of June 13, 1933, c. 61, 48 Stat. 125, which is codified in 46 U.S.C.A. §§ 392, 406–412. 38 Op.Att'y Gen. 441 (1936).

ida first enacted a pilotage statute in 1868 and the provision at issue in this case, Florida Statute § 310.11 (1973), is a direct descendant of an 1872 enactment. Set out in full below,[13] § 310.11 requires all vessels not exempted from its provisions that enter or leave a Florida port to pay pilotage fees either (a) to the state-licensed pilot who actually serves on board the vessel upon entering or leaving the port, or (b) to the first state-licensed pilot to contact the vessel and tender his services for the journey in or out of port. The pilotage fees are to be fixed by the board of pilot commissioners for each port, but the statute specifies a minimum rate. The statute also exempts certain vessels from its scope—namely, "all steamers or vessels drawing less than six feet of water and having a coastwise license." Although this exemption is framed in the conjunctive, federal pilotage laws—specifically 46 U.S.C.A. §§ 215, 364[14]—preclude Florida from regulating any vessels with a coastwise license (i. e., any vessels under enrollment) regardless of their draft. The exemption of § 310.11 must therefore be read in the disjunctive, leaving the statute applicable to all vessels entering or departing Florida ports except those under enrollment or drawing less than six feet of water.[15]

13. The board of each port may fix the rate of pilotage which shall be paid by any vessel entering their port; but in no case shall they fix rates less than the minimum rates herein provided. All steamers or vessels entering any port or leaving the same shall be subject to pay to any licensed pilot performing duty on board, or to the pilot who shall first speak to such steamer or vessel, the following rates of pilotage: A minimum rate of not less than sixty-six dollars for any steamer or vessel drawing less than eight feet; and for steamers or vessels drawing eight feet or over, a minimum rate of eight dollars and twenty-five cents per foot. These minimum rates shall apply to all steamers or vessels whether owned wholly by citizens of this state or not, except that all steamers or vessels drawing less than six feet of water and having a coastwise license shall be exempt from paying pilotage unless they employ a pilot. In the event a body other than the board has jurisdiction over the fixing of rates in a particular port or ports, such governing body may establish rates as authorized by law for the purposes specified.

Fla.Stat. § 310.11 (1973); see also note 15, infra.

14. See notes 11 and 12, supra.

15. Section 310.11 is unconstitutional to the extent that it purports to regulate pilotage on vessels under enrollment which draw more than six feet of water, but this infirmity has no bearing on this case. Cf. Ray v. Atlantic Richfield Co., supra, 435 U.S. at 158–60, 98 S.Ct. 988 (holding that although Washington Tanker Law was unconstitutional to the extent that it required enrolled tankers of greater than 50,000 deadweight tons to carry state-licensed pilots, the decision of the lower court invalidating the provision in its entirety was overly broad since states are free to impose pilotage requirements on registered vessels entering and leaving their ports).

Florida revised its pilotage statute, chapter 310, considerably in 1975. Among other significant changes, the 1975 statute eliminated the infelicitous syntax of § 310.11 which had seemingly, and unconstitutionally, extended Florida's pilotage regulation to enrolled vessels with a draft of six feet or more. As revised, the Florida compulsory pilotage statute now clearly exempts all enrolled vessels. See Fla.Stat. § 310.141 (1975). The 1975 revision also raised the exemption for shallow draft vessels from six feet to seven feet. See id. Even more significant, the new statute is truly a compulsory pilotage provision. Vessels to which the statute applies no longer have the option to refuse taking on board a state-licensed pilot, subject only to the requirement that they nonetheless pay pilotage fees to the first state-licensed pilot who tenders his services if in fact a pilot does contact the vessel. Under Fla.Stat. § 310.161 (1975), any vessel that is required to take on board a state-licensed pilot but does not do so is guilty of a misdemeanor of the second degree and is obligated to pay the licensed state pilots at the relevant port double the pilotage rates that would have otherwise been applicable. In yet another major change, the boards of pilot commissioners were granted much broader discretion in fixing the pilotage rates for each port than they possessed under § 310.11. See Fla.Stat. § 310.151 (1975).

Florida's pilotage regulations were again reconsidered, and a number of provisions changed, pursuant to the Regulatory Reform Act of 1976. See 1978 Fla.Sess. Law Serv., ch. 78–140. None of these most recent changes, however, affected the 1975 provisions noted in the preceding paragraph.

The 1975 revisions did not become effective until Oct. 1, 1975, and therefore have no bearing upon this suit against MECI, which involves a claim for pilotage fees through September 1975. Other references to Florida law elsewhere in this opinion, e. g., notes 16–20, 28–29, infra, also are to the provisions in force

In Florida, as in most other states, pilotage is regulated primarily through local administrative boards. There is a board of pilot commissioners, appointed by the governor with the advice and consent of the state senate, for each county in which a port is located.[16] Among other responsibilities, these commissioners examine and license pilots,[17] as well as set pilotage rates[18] and promulgate regulations,[19] for the ports within their jurisdiction.

### The Stage Set, The Players Reappear

PILOTS, plaintiffs in the instant litigation, are licensed by the Broward County Pilot Commission for both Port Everglades and Port Laudania.[20] Those two ports are contiguous areas served by the Port Everglades channel, and all seagoing vessels must use the Port Everglades channel to enter or exit either port.

MECI, according to evidence introduced at trial, has operated oceangoing tugs and barges, flying the American flag under registry, in and out of Port Everglades channel since 1964. Testimony of a MECI vice-president also revealed that it was company policy not to take on board local pilots, either for Port Everglades or Port Laudania or for any of the many other ports which MECI frequented, unless the company felt that its own Coast Guard-licensed captains were not fully competent to guide a vessel in or out of a particular port. Although PILOTS had billed MECI for pilotage fees as early as 1970, the fees that PILOTS seek to recover in this case are for MECI operations between June 1973[21] and September 1975.[22] During this period, MECI was making up to three trips a week between Port Laudania and Freeport in the Bahamas. Most trips involved one tug with

during the period encompassed by this litigation. But in restricting, as is necessary, our focus and our decision to Florida statutory law as it existed between June 1973 and September 1975, we do not mean to suggest that our decision would be any different under Florida statutory law as it now exists.

16. See Fla.Stat. § 310.01 (1973).

17. See Fla.Stat. § 310.03 (1973).

18. See Fla.Stat. § 310.11 (1973).

19. See Fla.Stat. § 310.015 (1973).

20. Both at trial and on appeal, MECI has disputed the fact that PILOTS are properly licensed for Port Laudania, and since MECI's vessels docked in Port Laudania and not Port Everglades, MECI contends that PILOTS have no standing to bring this suit. We find no merit to this threshold argument of MECI, for three reasons. First, MECI entered into a pretrial stipulation that "[PILOTS] have U. S. Coast Guard Pilots' Licenses for Port Everglades and Port Laudania, and have been duly licensed by the Broward County Pilot Commission for the above Ports." Second, the District Court explicitly included among its findings of fact at the conclusion of the trial that "the Port Everglades Pilots have been licensed by the Broward County Pilot Commission for Port Everglades and Port Laudania." Third, MECI introduced no evidence at trial that tends to contradict its pre-trial stipulation or the District Court's finding of fact. Rather, the only evidence bearing on the issue was that the eight individuals who compose PILOTS were, prior to 1973, operating under a charter from the Broward County Port Authority; that Port Everglades was first brought under Florida Statute § 310.03 (1973)—the statute prescribing the licensing and examination procedures for harbor pilots as well as the maximum number of pilots at specified ports—in 1973; and that the eight individual plaintiff pilots were properly grandfathered in pursuant to § 310.03. In addition, we take judicial notice of the fact that eight pilots does not exceed the number of state-licensed pilots allowed for Port Everglades and Port Laudania under § 310.03.

By virtue of being grandfathered in under § 310.03, the eight members of PILOTS did not have to pass individual examinations administered by the relevant board of pilot commissioners—in this case the Broward County Pilot Commission—as required by § 310.03 for all pilots licensed after June 1973. Nonetheless, each of the eight possessed a pilot's license issued by the United States Coast Guard, which had to be renewed periodically, and it was this certification of competence upon which the local pilot commissioners had relied in first issuing to each of the eight state pilot's licenses.

21. June 1973 coincides roughly with (1) MECI's purchase of Universal Alco, another company which conducted similar commercial shipping operations through the Port Everglades channel, and (2) the express inclusion of Port Everglades within the terms of Florida Statute § 310.03 (1973), see note 20, *supra*.

22. On October 1, 1975, § 310.11 was repealed and replaced by a markedly stricter compulsory pilotage statute. See note 15, *supra*.

an unmanned barge on hawser carrying truck trailers. For each and every instance in which PILOTS made a claim for fees, the trial court found that PILOTS communicated by radio or voice with MECI tugs and the tugs refused the offered pilotage services. For those trips in which MECI tugs towed a barge on hawser, PILOTS billed MECI for pilotage for both the tug and the barge, but the trial court awarded PILOTS fees amounting to 1½ times the pilotage due for the deeper draft vessel of the two, as authorized under the tariffs established by the Broward County Pilots Commission.

Several other factual issues are relevant to this appeal. At trial PILOTS admitted that they did not offer pilotage services to fishing boats, research vessels, and pleasure boats sailing under registry, even though such vessels, if they drew more than six feet of water, were within the scope of § 310.11. The reason for this omission according to PILOTS's testimony was that they thought (erroneously) that the Florida compulsory pilotage statute was applicable only to commercial vessels such as MECI's tugs and barges. There also was trial testimony to the effect that PILOTS offered discounts of varying amounts to some of the commercial vessels that sailed regularly in and out of Port Everglades and Port Laudania. PILOTS admitted offering a 20% discount to several "customers" if they would pay their bills promptly, but claimed that the practice had been discontinued as of June 1973. Although MECI was never offered this 20% discount, a MECI vice-president testified that it had been offered a 50% reduction in pilotage charges if it

would begin to pay for the pilotage it was not using. PILOTS denied this latter allegation. In any event, with respect to both issues of alleged disparate treatment, the trial court found (1) that it was the policy and practice of PILOTS to speak to all vessels that appeared to be commercial and that PILOTS thought were required to accept a pilot or pay pilotage fees, and (2) that MECI failed to show "a pattern of discrimination" by PILOTS.

### The Onslaught

The District Court entered judgment for PILOTS on the basis of 221 separate trips through the Port Everglades channel. MECI has at least spared us the chore of reviewing the District Court's findings as to the particular instances for which, it has been assessed pilotage fees. Nor does MECI contest the monetary dimensions of the judgment entered below.[23] Instead, with the objective of avoiding *any* payment of pilotage fees, it launches a broad legal attack on the very concept of compulsory state pilotage as it exists in Florida and as it operated in this case. MECI apparently recognizes the futility of challenging this imposition of state compulsory pilotage fees under the Commerce Clause. See *Cooley v. Board of Wardens, supra.* But both at trial and here on appeal it has assailed Florida Statute § 310.11 on its face and as applied by PILOTS on virtually every other conceivable ground as well as a few inconceivable ones. We will first review its various constitutional challenges, under both the United States and Florida Constitutions,[24] and then its assorted statutory arguments.[25]

23. While MECI does challenge the award of pilotage fees equal to 1½ times the pilotage due for the deeper draft vessel for all trips involving a tug and an unmanned barge on hawser, it does not contest the sum of the judgment entered against it ($27,807.69) if the 1½ formula is upheld. Indeed, the judgment from which it appeals is $6,517.16 less than the proposed judgment it submitted the District Court.

24. In order to avoid the tedious task of repeatedly citing the relevant clauses of the federal and state constitutions, we refer the reader to the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United

States Constitution and to their counterparts in Article I, Sections 2 and 9 of the Florida Constitution. Although, for the purposes of deciding this case, there is no reason to distinguish between federal and state constitutional law since MECI's challenges are no more meritorious under one than under the other, both federal and state decisions are cited with regard to those challenges lodged alternatively under either corpus of constitutional law.

25. An initial issue raised by MECI—the standing of PILOTS to bring this action—has already been disposed of. See note 20, *supra.*

*Due Process On Its Face*

Among the arguments that MECI has fished out of the waters and dressed up for our consideration is that § 310.11 on its face violates the Due Process Clause of the federal and state constitutions. MECI concedes that Florida has a valid police power interest in protecting life and property from haphazard navigation of vessels upon its waters, but it contends that for several reasons the statute does not bear a rational relation to the legitimate police power goals of the State of Florida. Specifically, it objects to (a) the required payment of pilotage fees when pilotage services are neither desired nor used; (b) the fact that it is required to take on board state-licensed pilots whose only formal certification of competence is a Coast Guard Pilot's License, see note 20, *supra,* when the captains of their vessels are also licensed by the Coast Guard; and (c) the fact that its vessels are subject to compulsory pilotage while similarly registered vessels drawing less than six feet are not.

■ MECI demands a much higher rationality—a much closer fit between the state's police power objectives and the statute enacted to secure those objectives—than federal or state due process jurisprudence requires of regulatory, "economic" legislation. It is clear that a "law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical Co.,* 1955, 348 U.S. 483, 487–88, 75 S.Ct. 461, 464, 99 L.Ed. 563; *see also Burnsed v. Seaboard Coastline R. R.,* Fla., 1974, 290 So.2d 13, 18 ("Legislative action exercised under the state's police power is valid if such exercise is confined to those acts which may reasonably be construed as expedient at least for the protection of public safety, public welfare, public morals or public health"); *Dutton Phosphate Co. v. Priest,* 1914, 67 Fla. 370, 65 So. 282, 284.

Section 310.11 is undoubtedly "more rational" than was the Oklahoma eyeglass law upheld by the Supreme Court in *Williamson, supra,* especially in light of the long history and widespread existence of compulsory pilotage laws. On several occasions, including its historic *Cooley* decision, the Supreme Court has detailed the rationale underlying a requirement that registered vessels pay for pilotage services whether used or not. See note 6, *supra.*

■ As to the second contention of MECI, it is true that to the extent the captains of its tugs satisfied the same formal standards of competence as did PILOTS, § 310.11 imposes a supernumerary requirement upon MECI. Nonetheless, it is not unreasonable to assume that PILOTS, by virtue of operating under their Coast Guard licenses solely and continuously in the Port Everglades-Port Laudania area, are more familiar as a practical matter with the Port Everglades channel and therefore better equipped to serve the state's police power interests than are MECI's tug captains. Moreover, PILOTS must stand ready to pilot foreign flag vessels whose captains normally would not possess overlapping licenses, and the exaction of pilotage fees from registered American vessels is not an arbitrary method for underwriting that additional important service. *See also Anderson Pacific Coast S.S. Co., supra,* 225 U.S. at 201, 32 S.Ct. 626 (rejecting a similar argument that if vessels sailing under register, although not required to employ a federally licensed pilot, did in fact have on board such a pilot, they could avoid state liability for pilotage fees).

■ Finally, with respect to MECI's third contention, the state of Florida was certainly justified in exempting from compulsory pilotage vessels of less than six feet draft on the theory that deeper draft vessels pose more of a hazard to life and property along the state's waterways.

In the event that MECI remains unsatisfied by our explanation, we can only remind it—although in most cases we presume it unnecessary to do so—that "[t]he day is gone when [federal courts use] the Due Process Clause of the Fourteenth Amend-

ment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson v. Lee Optical Co., supra,* 348 U.S. at 488, 75 S.Ct. at 464; *see also Ferguson v. Skrupa,* 1963, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93. The courts of Florida are no less respectful of legislative judgments concerning economic regulation than are the federal courts. See, *e. g., Newman v. Carson,* Fla., 1973, 280 So.2d 426, 428; *Dutton Phosphate Co. v. Priest, supra,* 65 So. at 285 ("The wisdom and necessity, as well as the policy, of a statute are authoritatively determined by the Legislature."). The sanctity of pilotage regulations from judicial secondguessing is even more firmly engrained than that of other forms of economic regulation. Indeed, the Supreme Court, less than one month after it rendered its ill-fated decision in *Lochner v. New York,* 1905, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937, unanimously rejected an attempt to evade the terms of a Virginia compulsory pilotage statute, remarking that the challenge presupposed "that courts are vested with authority to avoid the pilotage regulations adopted by the states, which do not discriminate as to commerce to which they apply, simply because it is deemed they are unwise or unjust." *Thompson v. Darden,* 1905, 198 U.S. 310, 316–17, 25 S.Ct. 660, 662, 49 L.Ed. 1064. Thus, even if we believed § 310.11 to be improvident, it is indisputable that it would be beyond our province to relieve MECI from its terms in the name of the Due Process Clause.

### Equal Protection On Its Face

But MECI, undaunted, also claims that § 310.11 *does* discriminate, *cf. Thompson v. Darden, supra,* and therefore violates on its face the Equal Protection Clause of the federal and state constitutions. Again it points to the exemption for vessels drawing less than six feet of water. In addition, it points to the exemption for enrolled vessels. Both distinctions, it claims, by excepting some vessels from compulsory pilotage but not its tugs and barges or other registered vessels with a draft of six feet or more, unconstitutionally discriminate against it.

■ To respond to this argument with more than a few perfunctory cites to decisions such as *Railway Express Agency v. New York,* 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533, and *Williamson v. Lee Optical Co., supra,* gives it a stature it scarcely deserves. We nonetheless point out that the legislative classifications MECI challenges are not based upon any "suspect" criteria. Nor do those classifications affect any fundamental interests. MECI does not claim, nor could it plausibly claim, that the statute was drafted with an intent to discriminate invidiously against it. The statute treats all vessels similarly circumstanced—*i. e.,* all vessels under registry that draw at least six feet of water—equally. In the absence of any suspect classification, invasion of fundamental interests, or invidious intent, all that the United States Constitution demands is that the classifications be rationally related to a legitimate state interest. See *City of New Orleans v. Dukes,* 1976, 427 U.S. 297, 303–04, 96 S.Ct. 2513, 49 L.Ed.2d 511; *see generally San Antonio Indep. School Dist. v. Rodriguez,* 1973, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16. Florida law is no different. See *Lasky v. State Farm Ins. Co.,* Fla., 1974, 296 So.2d 9, 18; *Finlayson v. Conner,* Fla.1964, 167 So.2d 569, 571 ("If there is a reasonable and practical ground of classification for legislative regulations under the police power, it should be upheld even though another classification or no classification would appear more reasonable.").

■ Our preceding discussion of the "rationality" of § 310.11 for purposes of due process analysis amply supports the statute's rationality for purposes of the Equal Protection Clause. This is especially clear if one bears in mind that "[s]tates are accorded wide latitude in the regulation of their local economies under their police powers, and [that] rational distinctions may be made with substantially less than mathematical exactitude," *City of New Orleans v. Dukes, supra,* 427 U.S. at 297, 96 S.Ct. at

2517. We observe further that MECI, in attacking the six-foot threshold for compulsory pilotage fee liability, ignores the logical fact that if Florida is to be permitted to exercise a legislative judgment that vessels of shallow draft pose little danger to the state's waterways and therefore need not be piloted by state-licensed pilots, it must be able to draw the line delineating "shallow draft vessels" somewhere. To do so at six feet, rather than five or seven, is not unreasonable.

■ Nor can Florida be faulted for exempting vessels sailing under enrollment from compulsory pilotage, since (1) Congress has already established an elaborate system for regulating the pilotage of such vessels, and, more to the point, (2) in establishing that system, Congress has preempted the states from engaging in similar regulation. In challenging the enrollment/registry distinction embodied by § 310.11, MECI in effect challenges the rationality of the long-established concurrent state-federal system for regulating pilotage. The Equal Protection Clause does not command us to disregard history and dismantle that system. In a similar context, in a case involving an attack upon the pilotage laws of Texas, the Supreme Court concluded that "the remedy is in Congress, in whom the ultimate authority on the subject is vested." *Olsen v. Smith*, 1904, 195 U.S. 332, 345, 25 S.Ct. 52, 55, 49 L.Ed. 224.

### Due Process And Equal Protection As Applied

Having held that § 310.11 does not, on its face, violate Due Process or Equal Protection, we confront MECI's second line of constitutional attack—that the statute *as applied* by PILOTS in this case violated its rights to equal protection and due process under the federal and state constitutions. It bases its as-applied argument on three separate grounds: (1) the fact that PILOTS charged it for pilotage fees even though its tug captains possessed Coast Guard licenses; (2) the fact that PILOTS did not offer pilotage services and charge pilotage fees to all vessels within the scope of § 310.11, but only to commercial vessels such as MECI's tugs and barges; and (3) the testimony concerning the various discounts PILOTS purportedly offered both MECI and other commercial shippers.

■ The first asserted ground of unconstitutional application of § 310.11 is merely a variation on one of MECI's facial challenges to the statute which we resolved against MECI. See p. 1345, *supra*. If, as we have held, the statutory authorization for collecting pilotage fees from registered vessels captained by Coast Guard-licensed personnel is rationally related to the state's legitimate police power interest, then application of the statute to the same vessels also passes the constitutional rational relationship standard.

■ The second and third grounds advanced by MECI bottom on not irrational, but discriminatory application of § 310.11 by PILOTS. It is beyond doubt that the constitutional mandate of equal protection extends to discriminatory executive or administrative conduct as well as to discriminatory legislation. See, e. g., *Yick Wo v. Hopkins*, 1886, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220; *Richey v. Wells*, 1936, 123 Fla. 284, 166 So. 817, 818. But it is also clear that "[t]he unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination." *Snowden v. Hughes*, 1943, 321 U.S. 1, 8–9, 64 S.Ct. 397, 401, 88 L.Ed. 497; *cf. Washington v. Davis*, 1976, 426 U.S. 229, 239–44, 96 S.Ct. 2040, 48 L.Ed.2d 597. An analogy can be drawn to the selective prosecution cases, in which it has been held that a defendant, in order to establish a prima facie case of discriminatory prosecution, must show that others similarly situated have not generally been proceeded against and that "the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i. e., based upon such impermissible considerations as race, religion, or the desire to prevent his exer-

cise of constitutional rights." See *United States v. Johnson*, 1978, 5 Cir., 577 F.2d 1304, 1308 (quoting *United States v. Berrios*, 1974, 2 Cir., 501 F.2d 1207, 1211); *see also Oyler v. Boles*, 1962, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446.

█ MECI has fallen far short in its effort to establish itself as a victim of unconstitutional discrimination under these principles.[26] The District Court found, and there is no evidence in the record to cast doubt on this finding, that it was the policy and practice of PILOTS to offer their services to all vessels that appeared to be commercial and that PILOTS thought were required to accept a pilot or pay pilotage fees. The fact that PILOTS were mistaken about the scope of § 310.11, and did not offer their services to fishing boats, research vessels, or pleasure boats, does not color their actions with the taint of unconstitutional discrimination. See *Sunday Lake Iron Co. v. Township of Wakefield*, 1918, 247 U.S. 350, 353, 38 S.Ct. 495, 62 L.Ed. 1154. Without a shred of evidence that PILOTS proceeded against MECI with an invidious intent, the presumption of good faith that attends all actions by public officials remains undisturbed. The testimony as to various discounts offered by PILOTS was inconclusive at best and in addition was only marginally relevant since it did not relate to the period encompassed by this litigation. But even if we were to accept all of it as true and as relevant, we would be left with the conclusion that MECI had been offered a *50%* discount while some other shippers had been given a *20%* discount—hardly the sort of fact pattern upon which to base a finding of discrimination *against* MECI. In sum, MECI has failed, miserably, in its second line of constitutional attack.

*Delegation Of Legislative Authority*

█ But MECI trots out yet another constitutional claim—that § 310.11 is constitutionally infirm under the Florida Constitution because it improperly delegates legislative authority to PILOTS. An identical challenge to a predecessor version of § 310.11 was made, and rejected, in *The Chase*, S.D.Fla., 1882, 14 F. 845. And notwithstanding the metamorphosis of the law on delegations of legislative authority since 1882, the instant challenge to § 310.11 must also be rejected.

> The fact that some authority, discretion or judgment is necessarily required to be exercised in carrying out a purely administrative or ministerial duty imposed by statute does not invalidate the statute. * * * [T]he true distinction is between the delegation of power to make the law, which necessarily involves a discretion as to *what the law shall be,* and the conferring of authority or discretion in executing the law pursuant to and within the confines of the law itself.

*Conner v. Joe Hatton, Inc.,* Fla., 1968, 216 So.2d 209, 211 (quoting, in part, *Hampton & Co. v. United States,* 1928, 276 U.S. 394, 407, 48 S.Ct. 348, 72 L.Ed. 624). All that is needed to sustain such a delegation of authority to execute the laws of Florida is "an intelligible principle * * * for the guidance of an administrative official in the performance of his duties." *Phillips Petroleum Co. v. Anderson,* Fla., 1954, 74 So.2d 544, 547. *See also State v. Griffin,* Fla., 1970, 239 So.2d 577; *Bailey v. Van Pelt,* 1919, 78 Fla. 353, 82 So. 789, 793. Section 310.11 satisfies these precepts.

*Statutory Hodgepodge*

MECI has also concocted a mélange of statutory arguments in its endeavor to escape the imposition of pilotage fees. We

---

**26.** PILOTS have argued that, assuming arguendo their acts amount to discrimination against MECI, the practices of state-licensed pilots are those of private individuals and thus do not constitute the sort of official or state action required for a violation of the Fourteenth Amendment of the United States Constitution or Article I, Sections 2 and 9 of the Florida Constitution. We, however, are inclined to view PILOTS as at least a quasi-state agency, but we need not decide any "state action" questions in light of our conclusion that PILOTS have not intentionally engaged in any discriminatory practices within the meaning of the federal and state constitutions.

will start with the best (the word is used, most decidedly, in a relative sense) and save the worst for last.

██ (1) First, MECI argues that § 310.-11 does not authorize PILOTS to impose and collect pilotage fees, either in whole or in part, for unmanned barges. It points to the statutory language "performing duty on board" or "speak[ing]" to vessels, see note 13, *supra*, and asks, rhetorically, how can one perform duty on or speak to a dumb barge?

It would be a perversion of legislative intent to read § 310.11 so literally that shippers could evade pilotage regulations by leaving vessels on tow unmanned so that they could not be spoken to in the first place nor subsequently boarded having never been spoken to. In actuality, the phrase "speak to" is a term of art, commonly understood in the maritime and pilotage context to mean "offer or tender services." [27] PILOTS certainly offered pilotage services for MECI's barges through the MECI personnel who were aboard the MECI tugs towing the barges on hawser. The District Court did not err in awarding pilotage fees based in part upon MECI's barges.

MECI also contends that PILOTS may not recover any fees because they failed to show that the rates set by the Broward County Pilot Commission were valid under § 310.11 and the Florida Administrative Procedure Act. The District Court, however, found that PILOTS's charges and fees were fixed by the Pilot Commission according to state law. We need not even test this finding against the clearly erroneous standard since MECI stipulated prior to trial that "PILOTS's charges and fees for Port Laudania and Port Everglades are fixed by the Broward County Pilot Commission pursuant to State Statute." That stipulation has not been modified and MECI is not entitled to be relieved of its import at this juncture.

██ (2) Second, MECI contends that PILOTS are without any authority to receive pilotage fees from MECI by virtue of Florida Statute § 215.31, which provides that various forms of revenue collected under the authority of Florida law by various state agencies, including "boards," must be deposited in the state treasury.[28] MECI contends that PILOTS act under the authority of a "board" (presumably the Broward County Pilot Commissioners) and that they are attempting to collect specific statutory "fees." This brings PILOTS within the terms of § 215.31, according to MECI's reading of the Florida Statutes, with the result that the pilotage fees must be deposited in the state treasury rather than received by PILOTS.

The short answer to this specious argument is that § 215.31 clearly is a state revenue statute and that pilotage fees have never been regarded as among the public revenues of a state. Historically, pilotage

---

**27.** In *The Mascotte*, S.D.Fla., 1889, 39 F. 871, the Court was confronted with an earlier version of § 310.11 and the question of what constitutes "a speaking" of a vessel within the contemplation of the law. It pointed out that
> The statutes of different states use different language in providing for the speaking of a vessel by a pilot. In New York, the term "offering his services" or "tendering his services" is used. In Pennsylvania, he "shall offer himself." The vessels going up the Delaware river must pay half pilotage for "refusing or neglecting" to take a pilot. In North Carolina the vessel "pays pilotage for refusing to take a pilot; " and in Louisiana, for "refusing to take a pilot when one offers." But there can be no question but what the legislatures of all states had one idea in common, and meant a plain and distinct offer by the pilot of his services, so made that the

master of the vessel could have it within his power to employ or refuse him.
> *Id.* at 872.

**28.** Fla.Stat. § 215.31 (1973) provides that
> Revenue, including licenses, fees, imposts, or exactions collected or received under the authority of the laws of the state by each and every state official, office, employee, bureau, division, board, commission, institution, agency or undertaking of the state shall be promptly deposited in the state treasury, and immediately credited to the appropriate fund as herein provided, properly accounted for by the department of banking and finance as to source and no money shall be paid from the state treasury except as appropriated and provided by the annual general appropriations act, or as otherwise provided by law.

fees have always been imposed and collected for the benefit of the pilots and not to augment the public fisc. This is also the case in Florida. Section 310.11 expressly provides that ships subject to its terms shall "pay to any licensed pilot" who performs pilotage duties or first speaks to the ship at least $66. See note 13, *supra.* Moreover, Florida Statute § 310.031, which MECI overlooks altogether, requires the county boards of pilot commissioners to collect from each state-licensed pilot a small percentage of the "pilotage earned by said pilot during each year." [29] Unmistakably, the Florida legislature contemplated that state-licensed pilots would retain the balance of those pilotage fees they "earned."

■ (3) MECI fastens upon a Florida appropriations statute as authority for the proposition that § 310.11 is invalid to the extent that it permits PILOTS to collect and disburse public funds that accrue to their pecuniary benefit as private citizens. Aside from the problems noted above concerning the application of general public revenue and appropriations statutes to pilotage fees, MECI's argument must fall as utterly without merit because the statute upon which it relies, Florida Statute § 282.041, was repealed in 1969 prior to the period for which PILOTS has been awarded pilotage fees.

■ (4) Last—and least (to conform the hackneyed expression to the situation)—is MECI's argument that the practices of PILOTS in charging only commercial vessels and in giving discounts constitute discrimination prohibited by 46 U.S.C.A. § 213.[30] There is nothing arcane about that statute. It means what any law student and most laymen would conclude that it means: state pilotage laws may not discriminate against steam vessels or national vessels of the United States nor may they discriminate in the pilotage rates they set according to the state from which a vessel has sailed. See *Thompson v. Darden, supra; Olsen v. Smith, supra ; Spraigue v. Thompson,* 1886, 118 U.S. 90, 6 S.Ct. 988, 30 L.Ed. 115. The statute has no application to the practices of PILOTS with respect to vessels sailing under registry in the foreign trade.

### Postscript

To be sure, state compulsory pilotage is not a body of law familiar to most legal practitioners, much less one at the forefront of public attention. Yet it is not a particularly difficult body of law. Indeed, unlike the state of flux that characterizes many areas of contemporary law, pilotage law is remarkably straightforward and firmly established. We are somewhat dismayed that so much time and so many resources have been consumed in depositions and interrogatories, in trial, and in appellate litigation before PILOTS can recover the pilotage fees they clearly are entitled to under Florida law.

AFFIRMED.

---

**29.** Fla.Stat. § 310.031 (1973) provides that

The board shall receive annually from each pilot 1 percent of the gross amount of pilotage earned by said pilot during each year, to be paid by each pilot at such times and in such manner as the board shall prescribe; and this 1 percent of pilotage shall be in lieu of all other fees and compensation now paid to said board by any pilot into any port into which come annually one hundred vessels of five hundred tons burden and upwards.

**30.** 46 U.S.C.A. § 213 states that

No regulations or provisions shall be adopted by any State which shall make any discrimination in the rate of pilotage or half-pilotage between vessels sailing between the ports of one State and vessels sailing between the ports of different States, or any discrimination against vessels propelled in whole or in part by steam, or against national vessels of the United States; and all existing regulations or provisions making any such discrimination are annulled and abrogated.